# Richmond

**Globe Iron Construction Company, Incorporated v. The First National Bank of Boston and Frank W. Rogers and Leonard G. Muse, Receivers of Towers Shopping Center, Incorporated.**

March 8, 1965.

Record No. 5858.

Present, Eggleston, C. J., and Spratley, Buchanan, Snead, I'Anson and Carrico, JJ.

E. *Griffith Dodson, Jr.* (*Dodson, Pence & Coulter*, on brief), for the appellant.

*Frank W. Rogers* and *John L. Walker, Jr.* (*Woods, Rogers, Muse & Walker; Lyne, Woodworth & Evarts*, on brief), for the appellees.

EGGLESTON, C. J., delivered the opinion of the court.

The First National Bank of Boston filed its bill in the court below, alleging that Times-World Corporation had leased certain land in the city of Roanoke to Towers Shopping Center, Incorporated, on which the latter had agreed to construct a shopping center at a cost of at least $2,500,000; that the bank had entered into an agreement with Towers to make a construction loan of $3,000,000 on the property; that pursuant to this agreement Towers had executed and delivered to the bank three notes, payable to the bank, in the principal sums of $2,500,000, $500,000, and $500,000, respectively, each bearing interest at the rate of 6½% per annum, and secured by first, second and third lien deeds of trust, respectively, on the property, that at the time of the filing of the bill the bank had advanced $3,199,154.-38 toward the cost of the construction of the building; that the building had been substantially completed, and that numerous mechanics' liens had been filed thereon, including one of Globe Iron Construction Company, Incorporated for $91,050.18.

The bill further alleged that under the provisions of the first lien deed of trust the bank had the right to make available to the trustees named therein "the necessary funds for the satisfaction of all present and potential mechanics' liens and to have the amounts so advanced become a part of the debt secured by the first mortgage, with interest as therein provided."

The prayer of the bill was that the trustees in the three deeds of

trust be appointed as receivers of Towers; that all present and potential lien creditors of Towers be convened, and the amounts and priorities of their several liens ascertained.

Numerous mechanics' lien creditors, including Globe, were made parties defendant to the bill. Globe filed an answer in which it prayed for the satisfaction of its lien. It admitted the allegation in the bill that under the provisions of the first mortgage the bank had the right to make available to the first mortgage trustees the necessary funds for the satisfaction of all present and potential mechanics' liens and to have the amounts so advanced become a part of the debt secured by the first mortgage.

Later Globe filed a petition in the proceeding, alleging that it had furnished and erected all of the structural steel required for the construction of the building at an agreed price of $481,050.18; that it had been paid on account the sum of $390,000, leaving a balance due it of $91,050.18, with interest thereon from January 15, 1961, and that it had filed a mechanic's lien on the property to secure the payment of this amount. It prayed for the enforcement of its lien and the payment of the balance due it, with interest thereon as stated.

The matter was referred to a special master to ascertain and report *inter alia* the liens on the property and their priorities. During the course of the proceedings, without objection, the lower court directed the payment out of the proceeds of the construction loan made by the bank of various mechanics' liens in the total amount of $468,-260.50, with interest, which were held to be prior to the liens of the three deeds of trust held by the bank. It was further decreed that the indebtedness secured by the first lien deed of trust was, according to its terms, increased by the amount of such payments. Among the mechanics' liens so paid was that of Lublin, McGaughy & Associates, architects, for $42,102.03, of which more will later be said.

In due course the special master heard the evidence on the claim of Globe for the enforcement of its mechanic's lien. At this hearing counsel for the bank took the position that according to the terms of a subordination agreement executed by Globe, Globe had agreed to subordinate its mechanic's lien to the liens of the first two deeds of trust held by the bank securing indebtednesses of Towers for $2,-500,000 and $500,000, respectively, and all additional indebtednesses of Towers thereby secured. Globe took the position that this agreement had been executed by it upon the express understanding that its mechanic's lien was to be subordinated only to the total principal indebtedness of $3,000,000 secured by the first two deeds of trust.

The special master reported that Globe was entitled to a mechanic's lien against the property in the sum of $91,050.18, with interest thereon from January 15, 1962, but that pursuant to the terms of the subordination agreement executed by Globe, in which there was "no ambiguity or uncertainty," its lien was subordinated to the liens of the first two deeds of trust held by the bank "and to all debts held to be secured thereby," without limitation to the total of $3,000,000 as contended for by Globe.

The special master further held that it was "neither necessary nor appropriate, for a determination of the matters in dispute between Globe and the bank, to consider the previous disposition by the court of the claim of Lublin, McGaughy & Associates."

From a decree overruling its exceptions to the report Globe has appealed. Specifically, it contends:

(1) Construed in the light of the evidence surrounding the execution of the subordination agreement, Globe did not thereby agree to subordinate its claim to more than $3,000,000, that is, the principal amount of the two notes of $2,500,000 and $500,000 secured by the first and second lien deeds of trust.

(2) The mechanic's lien claim of Globe is entitled to priority equal to that of the architects, Lublin, McGaughy & Associates, which was paid although those claimants had signed a subordination agreement similar in terms with the agreement signed by Globe.

(3) The lower court erred in confirming the report of the special master holding that interest on Globe's claim of $91,050.18 ran from January 15, 1962 instead of from January 15, 1961.

At the time of the execution of the subordination agreement on August 2, 1961, Towers was indebted to Globe in the sum of $481,050.18 for structural steel furnished and work done on the building. Towers was then in financial difficulties and was being pressed by Globe for payment of the account.

Arthur Peregoff, secretary and treasurer of Globe, testified that on July 31, 1961, he received a telephone call from L. T. Zoby, president of Towers, who was then in Boston trying to negotiate a construction loan on the building from The First National Bank of Boston. Zoby told Peregoff that he could secure such a loan from the bank, out of which Globe would be paid "around $300,000 immediately," provided Globe would sign a subordination agreement. Peregoff said that he had never heard of a subordination agreement. When he asked Zoby what the term meant, Zoby put on the tele-

phone a representative of the bank who undertook to explain the meaning of the term.

Peregoff further testified that in the course of the conversation the representative of the bank "indicated" that the bank was prepared to advance Towers the sum of $2,500,000, and to protect itself "further" would have a second deed of trust of $500,000, "so that I would be subordinating to $3,000,000." Zoby supplemented this statement by explaining to Peregoff that Globe would subordinate its lien to two liens of the bank for $2,500,000 and $500,000, respectively. Peregoff told Zoby that he would have to discuss the matter with Globe's local attorneys.

The proposed subordination agreement was prepared in Boston and forwarded either to Globe's office at Norfolk or to its attorneys there. Presumably, Peregoff revealed to counsel for Globe his conversation with Zoby and the representative of the bank as to the terms of the proposed agreement. So far as the record shows, no question was raised as to whether the draft of the agreement was in accordance with this understanding.

In any event, upon the advice of Globe's counsel, it was decided that the agreement should be executed and delivered in return for the largest possible cash payment which could be obtained out of the proposed construction loan. In furtherance of this plan, Ira B. Hall, a member of the law firm representing Globe, took the agreement to Roanoke where he met an official of the bank. After negotiations between Hall and this official it was agreed that Globe would receive a cash payment of $390,000 on its claim and in consideration thereof would deliver to the bank the subordination agreement. The matter was settled on this basis.

The special master thus summarized the evidence before him on this phase of the case: "The agreement was not signed by Globe precipitately, but after mature consideration. Moreover, the signing and delivery were after extended consultation with its attorneys. No one seems to have objected to the terms of the agreement. It is apparent from the evidence that Globe's primary, if not exclusive, consideration given to the matter concerned the amount of money it was to receive as an inducement to subordinate its lien."

The subordination agreement which is the crux of the case, is copied in the margin.[1]

---

[1] "SUBORDINATION AGREEMENT

"WHEREAS, the undersigned Contractor has furnished to Towers Shopping Center, Inc. (Towers), a Virginia corporation, of Norfolk, Virginia, certain labor

We agree with the report of the special master, confirmed by the decree of the lower court, that there is no ambiguity or uncertainty in the provisions of the subordination agreement and that by its plain terms Globe has subordinated its mechanic's lien not only to the principal amounts of the two notes totaling $3,000,000, secured by the first two deeds of trust, but also to *all debts* secured by such deeds of trust.

As has been said, according to the terms of the deeds of trust they secure both the principal amounts of the two notes totaling $3,000,000, and in addition thereto any amounts advanced by the bank for the satisfaction of present and potential mechanics' liens which were prior to the liens of the two deeds of trust. During the course of the proceedings such liens, amounting to $468,260.50 with interest, were paid off by the bank.

It will be observed that the preamble in the subordination agreement reads that, "WHEREAS, in order to induce the financing of said improvements by said Bank, the Contractor has agreed to *subordinate all mechanics' liens and all rights which might otherwise enjoy priority over the rights and interests constituted by said Deeds of Trust*." (Emphasis added.)

and materials in the construction of certain improvements to the leasehold estate of Towers situated on Brandon Road and Colonial Avenue, in Roanoke, Virginia, hereinafter called Towers Shopping Center, and more particularly described in two certain Deeds of Trust dated July 27, 1961, executed and delivered by Towers to the Trustees thereunder for the benefit of The First National Bank of Boston (Bank), a national banking association of Boston, Massachusetts; and

"WHEREAS, in order to induce the financing of said improvements by said Bank, the Contractor has agreed to subordinate all mechanics' liens and all rights which might otherwise enjoy priority over the rights and interests constituted by said Deeds of Trust, by reason of such materials having been furnished or work performed in said construction or in relation thereto;

"NOW, THEREFORE, the Contractor, for and in consideration of the premises and of the sum of Five ($5.00) Dollars, at or before the ensealing and delivery hereof by the said Bank paid, the receipt whereof is acknowledged by the Contractor, has remised, released and forever quitted claims, and by these presents does remise, release and forever quitclaim unto the said Trustees and the said beneficiary Bank, and all those claiming by, through and under them, and each of them, under said Deeds of Trust or either of them (the first given to secure the payment of an indebtedness of Two Million Five Hundred Thousand ($2,500,000) Dollars, and the other to secure the payment of an indebtedness of Five Hundred Thousand ($500,000) Dollars), all and all manner of liens, claims and demands whatsoever which the Contractor has or might or could have on or against Towers Shopping Center for work done or materials furnished, and also for all work or materials which may hereafter be done or furnished to said Towers Shopping Center or otherwise however; so that said Trustees and the Bank, their successors and assigns, and each of them, may have, hold and enjoy their respective rights and estates under said Deeds of Trust, and each of them, free and discharged from all liens,

Under the terms of the subordination clause, "the Contractor, * * * by these presents does *remise, release and forever quitclaim unto the said Trustees and the said beneficiary Bank,* * * * *under said Deeds of Trust or either of them* (the first given to secure the payment of an indebtedness of Two Million Five Hundred Thousand ($2,500,000) Dollars, and the other to secure the payment of an indebtedness of Five Hundred Thousand ($500,000) Dollars), *all and all manner of liens, claims and demands whatsoever which the Contractor has or might or could have on or against Towers Shopping Center* * * * *so that said Trustees and the Bank,* * * * *may have, hold and enjoy their respective rights and estates under said Deeds of Trust, and each of them, free and discharged from all liens, claims and demands whatsoever which the Contractor has or might or could have on or against Towers Shopping Center* * * * .*" (Emphasis added.)

We agree with the special master that the parenthetical language in the subordination clause "[the first given to secure the payment of an indebtedness of Two Million Five Hundred Thousand ($2,500,-000) Dollars, and the other to secure the payment of an indebtedness of Five Hundred Thousand ($500,000) Dollars]" was intended as an identification of the two deeds of trust therein referred to and

claims and demands whatsoever which the Contractor has or might or could have on or against Towers Shopping Center if these presents had not been made. The Contractor warrants to said Trustees and to said Bank that all laborers employed by said Contractor upon the aforesaid leasehold premises or in the fabrication of any material supplied thereto have been fully paid, and that none of such laborers has any claim, demand or lien upon Towers Shopping Center, and the Contractor further warrants to said Trustees and to said Bank that the Contractor has not assigned, pledged or hypothecated any claims or rights to payment due it from Towers, or with respect to any labor or material done upon or furnished to Towers Shopping Center, and that the Contractor has full right and authority to execute this release and to disclaim any liens as to said Trustees and to said beneficiary Bank as aforesaid.

"The Contractor further agrees that no change in the terms of either of said Deeds of Trust, or the indebtedness secured thereby, nor any extension of the maturity dates of either of the notes evidencing said indebtedness, nor any other forms of forbearance with respect to the obligations of Towers to the Bank shall affect the priority of the Bank's claim(s) over that of those of the Contractor.

"Nothing herein contained shall limit or impair, or operate to the prejudice of any claim for payment the Contractor has or may have against Towers, but all such claims shall be, and the Contractor does hereby agree to hold the same subject to and subordinate to the rights and estates of the Trustees and Beneficiary under said Deeds of Trust, and of all those claiming by, through or under them, or any of them.

"IN WITNESS WHEREOF the Contractor GLOBE IRON CONSTRUCTION COMPANY, INCORPORATED, has caused these presents to be signed by M. L. MEDNICK, its President, and its corporate seal to be hereto affixed and attested by Arthur Peregoff, its Secretary, this 2nd day of August, 1961."

was not designed to limit the subordination of Globe's lien to the principal amounts of the indebtednesses therein stated.

The gist of Globe's contention is that the terms of the agreement are not in accord with what Peregoff understood they would be. The answer is that where an agreement is complete on its face, is plain and unambiguous in its terms, the court is not at liberty to search for its meaning beyond the instrument itself. *Cranes Nest Coal & Coke Co.* v. *Virginia Iron, etc., Co.*, 105 Va. 785, 790, 54 S. E. 884; 17 Am. Jur. 2d, Contracts, § 245, p. 634. This is so because the writing is the repository of the final agreement of the parties. *Pulaski National Bank* v. *Harrell*, 203 Va. 227, 233, 123 S. E. 2d 382, 387; 7 Mich. Jur., Evidence, § 130, p. 487; *Id.*, § 131, pp. 488, 489; *Id.*, § 132, pp. 489, 490.

Globe next contends that its claim should be paid because early in the proceedings the mechanic's lien claim of the architects, Lublin, McGaughy & Associates, was paid although those claimants had signed a subordination agreement practically identical in terms with the agreement which Globe had signed. Globe argues that the bank having waived its right to rely on the architects' subordination agreement, should be estopped to rely on Globe's subordination agreement.

We agree with the special master that the payment of the architects' claim has no bearing on whether the Globe claim should be paid. The fact that the bank saw fit to waive its rights under the subordination agreement which it had with the architects is no reason why it should be compelled to waive its rights under the separate and distinct subordination agreement which it had with Globe.

Moreover, it appears that there was adequate consideration for the waiver by the bank of the architects' subordination agreement. At the time of the commencement of the proceedings the architects had recorded a mechanic's lien for $53,885.63. But their work had not been completed. A compromise was effected between the bank and the architects as the result of which the latter reduced their claim by approximately $11,000 and agreed to continue with the work. In consideration thereof the bank agreed to waive its rights under the subordination agreement and pay the reduced amount of the architects' bill. This in no way affected the rights existing between the bank and Globe under their agreement.

In his report the special master stated that, "On January 19, 1962 Globe filed a memorandum of mechanic's lien for $91,050.18, with interest from January 15, 1961 (*the date obviously should be*

*January 15, 1962*) against the leasehold estate of Towers Shopping Center, Inc., which is the subject of this suit." (Emphasis added.) Later in his report, without further explanation or discussion, the special master held that Globe was entitled to a lien in the amount stated with interest from the later specified date.

We find in the record no basis for fixing the time from which interest should run on the Globe claim as January 15, 1962 rather than January 15, 1961.

Pursuant to Code (Repl. Vol. 1953), § 43-22, in its petition to enforce its mechanic's lien, Globe filed an itemized statement of the account showing the amount due and claiming interest thereon from January 15, 1961. There was no denial of Globe's allegation that it was entitled to interest from this date. The appellees' brief states: "The commissioner apparently thought this a typographical error." Accordingly, he allowed interest from what he mistakenly thought was the intended date, January 15, 1962. Without discussion, the lower court confirmed this obvious error of the commissioner. Thus it appears that this is not a case in which the court has exercised its discretion in the allowance of interest under Code (Repl. Vol. 1957), § 8-223. It is a situation in which the date from which interest should be allowed was fixed because of an obvious error.

To correct such obvious error, the decree appealed from will be modified to allow interest on Globe's claim from January 15, 1961. As so modified, it will be affirmed. The appellees having substantially prevailed on this appeal will recover their costs. Code (Repl. Vol. 1964), § 14.1-181.

*Modified and affirmed.*