In re VIENNA PARK PROPERTIES, a Limited Partnership, Debtor.

VIENNA PARK PROPERTIES, Plaintiff,

v.

TRUSTBANK SAVINGS, F.S.B. and United Postal Savings Association, Defendants.

Bankruptcy No. 89–B–12967 (CB).
Adv. No. 90–6122A.

United States Bankruptcy Court, S.D. New York.

March 5, 1991.

Glass & Eckstein, P.C. by Andrew B. Eckstein, James D. Glass, New York City, for plaintiff.

Stroock & Stroock & Lavan by Joseph J. Giamboi, New York City, for defendants Trustbank Sav., F.S.B. and United Postal Sav. Ass'n.

DECISION ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT SEEKING DETERMINATION THAT BANK'S ALLEGED LIEN AGAINST ESCROW FUNDS HAS EXPIRED AND/OR IS UNENFORCEABLE

CORNELIUS BLACKSHEAR, Bankruptcy Judge.

The Debtor seeks a determination, by summary judgment, that the residual portion of a certain escrow account constitutes property of the Debtor's estate. The Defendants, Trustbank Savings, F.S.B. ("Trustbank") and United Postal Savings Association ("United Postal") oppose the motion for summary judgment on the grounds that, *inter alia,* there exists genuine material issues of facts.

## FACTS

The dispute arises from several agreements entered into by the Debtor, the Defendants and other parties in interest sometime ago. The Debtor owns and leases for rental a three hundred (300) unit condominium garden apartment complex located in Vienna, Virginia (the "Condominiums"). The Debtor acquired the Condominiums on June 22, 1984 from Vienna Park Associates (the "Seller"). In connection with the acquisition of the Condominiums, the Debtor executed three hundred (300) first deed of trust notes (collectively the "Notes") and first deeds of trust to secure the payment of same (collectively the "Deeds of Trust") in favor of Congressional Mortgage Corporation (the "Initial Lender"), and three hundred (300) subordinate purchase money second deed of trust notes and second deeds of trust in favor of the Seller. The Notes were to mature five (5) years later on June 22, 1989 (the "Maturity Date"); however, they contained provisions for renewal of same.

### 1. *The Escrow Agreement*

Pursuant to the provisions of the amended purchase agreement, the Debtor entered into a written escrow agreement, dated June 22, 1984, along with the Seller and certain of the Seller's principal's (the "Escrow Agreement"), which provided for the establishment of an escrow account (the "Escrow Account") to assure the Debtor's ability to pay, relative to the Condominiums, any operating deficits and to meet its debt service. The Escrow Agreement was to terminate on the earlier of the sale of the Condominiums by the Debtor or

June 22, 1989, the fifth year anniversary of the Escrow Agreement (the "Escrow Period").

The amended purchase agreement entered into by and among the Debtor and the Seller provides as follows:

12. ESCROW ACCOUNT.

A. Pursuant to requirements of Lender, at Closing an escrow account ... shall be established in the sum of Two Million Five Hundred Thousand Dollars ($2,500,000) of which Two Million ($2,000,000) shall be paid from the proceeds of the Loans.... The Loan Escrow shall be immediately placed by the Title Company into the Escrow Account to be held and disbursed in accordance with that certain Escrow Agreement between Seller, Purchaser, Advancing Parties and Escrow Agent.... *The Escrow Account shall be conditionally assigned to Lender.*

\*    \*    \*    \*    \*    \*

C. It is understood and agreed that the Escrow Account and the Additional Escrow Account *shall be created in order to establish funds wherefrom certain operating deficits of the Condominium Project shall be paid,* all as more particularly described below. In the event the Loan Escrow together with the Purchaser's Contribution, plus interest thereon resulting from investment of funds in the Escrow Account as provided in the Escrow Agreement, together with funds in the Additional Escrow Account and interest thereon, are insufficient during the Guarantee Period ... to pay all Deficiencies of the Condominium Project as described below, Seller, Michael Gordon and Herbert M. Luksch, jointly and severally, will bear the costs of such excess Deficiencies. (Emphasis added)

The Escrow Agreement provides as follows:

WHEREAS, under the Agreement of Sale, the parties agreed to create, at Closing thereunder, an escrow account (the "Escrow Account") form which to pay certain costs of the Condominium Project as described in the Agreement of Sale, and to deposit into the Escrow Account at Closing Two Million Five Hundred Thousand Dollars ($2,500,000), of which $500,000 shall be paid by Purchaser as provided in the Agreement of Sale and shall be referred to as "Purchaser's Contribution" and the balance shall be paid from the proceeds of Loans described in the Agreement of Sale and shall be referred to as the "Loan Escrow"; and

\*    \*    \*    \*    \*    \*

NOW THEREFORE, ... the parties hereby agree as follows:

\*    \*    \*    \*    \*    \*

3. Within ten (10) days following receipt of an Invoice from Management Agent, delivered in accordance with Paragraph 14 of the Agreement of Sale, Escrow Agent shall advance the amount specified therein from the Escrow Account first from Purchaser's Contribution and then from the remaining funds in the Escrow Account until the earlier of (a) the date on which no funds remain therein, or (b) the termination of the Escrow Agreement.

\*    \*    \*    \*    \*    \*

[5](e). Upon the earlier to occur of (i) the occurrence of the event set forth in Paragraphs 14E(ii) of the Agreement of Sale or (ii) the fifth anniversary hereof, Escrow Agent shall, within ten (10) days after either (A) receipt of notice from Purchaser (with respect to clause (e)(i) above, or (B) the date described in clause (e)(ii), above, disburse to Purchaser the balance of the funds remaining in the Escrow Account prior to such disbursement;

\*    \*    \*    \*    \*    \*

12. This Escrow Agreement shall terminate upon the earlier to occur of (a) the fifth anniversary hereof; or (b) the sale, conveyance or transfer of all the Units.

2. *The Collateral Assignment*

As additional collateral to the Initial Lender, the Debtor, the Seller and the prin-

cipals of the Seller entered into an assignment of their respective rights under the Escrow Agreement (the "Collateral Assignment") to the Initial Lender. The Collateral Assignment provides the following:

> Management Agent and Borrower have agreed to assign their interest in the Escrow Account to Secured Party as security for the repayment of the Notes.

>     *      *      *      *      *      *

> 1. Assignors hereby assign to Secured Party *their rights to receive funds now or hereafter deposited in the Escrow Account in accordance with the Escrow Agreement.* This assignment is made as collateral security for the full and prompt payment and performance by Borrower of its obligations under the Notes and Deeds of Trust and shall be allocated 58% as security for the Vienna Park South Deeds of Trust and Notes secured thereby and 42% as security for the Vienna Park North Deeds of Trusts and Notes secured thereby.

>     *      *      *      *      *      *

> 3. *Assignors warrant that there will be no modification of the terms of the Escrow Agreement without the prior written consent of Secured Party.*

>     *      *      *      *      *      *

> 5. *This Assignment shall terminate on the first date on which a release of each and every Deed of Trust shall have been recorded among the land records of Fairfax County, Virginia.* (Emphasis added.)

### 3. *The United Postal Assignment*

■ On or about August 6, 1984, the Initial Lender sold 53.94% of the Notes and Deeds of Trust to United Postal and, subsequently, 46.06% thereof to Trustbank. The Initial Lender and United Postal entered into an agreement assigning 53.94% of the Initial Lender's interest in the Escrow Agreement to United Postal (the "United Postal Assignment"). In the instant action the Defendants stand in the shoes of the Initial Lender.[1] The express language of the United Postal Assignment states:

> 1. Assignor hereby assigns 59.34% of its interest in the Escrow Account and in the Additional Escrow Account, including, but not limited to, its right to receive funds now or hereafter deposited herein in accordance with the Escrow Agreement and Additional Escrow Agreement.

> 2. The rights of the Assignee with respect to the Escrow Account and the Additional Escrow Agreement shall be governed by the terms of that certain Participation Agreement by and between Assignor and Assignee dated February 3, 1983.

> 3. *This Assignment shall terminate on the earlier of (i) the date on which a release of each and every Deed of Trust securing the Notes owned by Assignee shall have been recorded among the land records of Fairfax County, Virginia, or (ii) the termination of the Escrow Agreement and the Additional Escrow Agreement.* (Emphasis added)

As of the maturity date of the Notes, the Debtor was current in its obligations under the Notes and the Debtor had notified the Banks of its desire and intent to renew the obligations underlying the Notes pursuant to their terms. In connection with this Court's decision dated October 23, 1990, this Court concluded that the Debtor had exercised its rights to renew the obligations which had been evidenced by the Notes and that it was not until subsequent to the Maturity Date that the Debtor defaulted in its obligations to the Defendants.[2]

---

1. Trustbank, the purchaser of the remaining Notes and Deeds of Trust from the Initial Lender, claims to also stand in the shoes of the Initial Lender. Unlike United Postal, Trustbank did not execute an assignment agreement with the Initial Lender. The failure to do so is not fatal to Trustbank since under Virginia law, a transfer of the secured debt includes the security without the need for a written assignment. *Stimpson v. Bishop,* 82 Va. 190, 200 (1886). *See also, Gregg v. Sloan,* 63 Va. 497, 499 (1882). Accordingly, Trustbank, along with United Postal, stands in the shoes of the Initial Lender.

2. *In re Vienna Park Properties,* 120 B.R. 332, 338 (Bankr.S.D.N.Y.1990).

### 4. *The Dispute*

The Escrow Agreement provides that any remaining funds in the Escrow Account shall belong to the Debtor. The Collateral Assignment provides that what is being assigned is the Debtor's "rights to receive funds ... deposited in the Escrow Account in accordance of the Escrow Agreement" (¶ 1) and provides for the termination of the assignment "on the first date on which a release of each and every Deed of Trust shall have recorded...." (¶ 5.) Herein lies the dispute, the Debtor claims that the rights assigned to the Initial Lender did not survive the expiration of the Escrow Agreement. That is to say, if on the expiration of the Escrow Agreement the Debtor was not in default of the Notes and Deeds of Trust, the Debtor would retain the interest in any funds remaining in the Escrow Account. The Debtor reads the Collateral Assignment as terminating at the *earlier* of the termination of the Escrow Agreement *or* upon the release of each and every Deed of Trust. The Defendants take the position that the intention of the Initial Lender cannot be properly interpreted by summary judgment because the crucial document, the Collateral Assignment, is by no means clear. The Defendants claim that it is not clear whether the parties intended to incorporate the Escrow Agreement into the Collateral Agreement or whether the Collateral Assignment was intended to survive the termination of the Escrow Agreement.

Both parties also dispute the categorization of what interests were in fact transferred. The issue of whether the Defendants properly perfected their secured interests is determined by the categorization of what interests were in fact transferred. The Debtor views the assignment as that of contract rights, while the Defendants equate the assignment to that of an interest in money, *i.e.*, the funds deposited in the Escrow Account.

The task this Court is faced with is twofold: (1) to determine who has entitlement to the funds remaining in the Escrow Account as of the termination of the Escrow Agreement, and (2) to determine what was the nature of the interest and rights assigned.

### DISCUSSION

#### A. *Treatment of the Documents*

■ As a threshold matter, in order to make a determination, the Escrow Agreement and the Collateral Assignment must be treated as interdependent and interrelated documents. Indeed the Collateral Assignment provides for such treatment because it specifically makes reference to the Escrow Agreement. First, the Collateral Assignment refers to the assignment of the Debtor's "rights to receive funds now or hereafter deposited on the Escrow Account *in accordance of the Escrow Agreement*." (¶ 1.) (Emphasis added.) Second, the Collateral Assignment provides that any "modification of the terms of the Escrow Agreement" may not be made without the secured party's written consent. (¶ 3.) Clearly, the Collateral Assignment does not exist in a vacuum; it pertains to certain rights of the Debtor created by the Escrow Agreement. Accordingly, the Collateral Assignment and the Escrow Agreement must be treated as interdependent and interrelated documents.

#### B. *Summary Judgment*

The standard for summary judgment is well established. Suffice it to say that summary judgment shall be granted where there does not exist a dispute as to a material issue of fact and the movant is entitled to judgment as a matter of law. *See, Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(c)); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 599, 106 S.Ct. 1348, 1362–63, 89 L.Ed.2d 538 (1986).

The terms of the Escrow Agreement, and the Collateral Assignment provides this Court with a sufficient basis from which to glean the intentions of the parties. Therefore, summary judgment is appropriate in this matter.

## C. *Categorization of the Rights Assigned*

■ The issue of what rights were in fact transferred through assignment will be addressed first. The parties do not dispute that the Collateral Assignment gave to the Initial Lender a security interest. The Collateral Assignment provides that the "Secured party shall have all rights and remedies of a secured party under the Uniform Commercial Code of Virginia...." (¶ 4.) The question that remains, however, is what exactly the Collateral Assignment granted the Initial Lender a secured interest in? If it was an assignment of contract rights, a general intangible, then neither of the Defendants have taken the steps necessary to properly perfect their secured interest. Pursuant to the Virginia Code, in order to perfect a security interest in a general intangible a party must file financing statements. *See*, Virginia Code § 8.9–302.

On the other hand, if the interest is an interest in money, then perfection is accomplished by possession by the secured party. *See*, Virginia Code § 8.9–304(1). There exists case law which supports the view that notice of a default to the escrow agent who is in possession of the collateral money constitutes perfection under the Commercial Code. *See, In re Copeland*, 531 F.2d 1195, 1203 (3d Cir.1976); *Matter of O.P.M. Leasing Services, Inc.*, 46 B.R. 661, 670 (Bankr.S.D.N.Y.1985).[3]

■ Pursuant to the Escrow Agreement, the Debtor had an interest in any residual funds in the Escrow Account remaining as of the termination of the Escrow Period. This is the only interest that the Debtor could have transferred. The Debtor was by no means guaranteed any money at all. The Defendants claim to have been assigned an interest in the $2,500,000.00 which was to be placed in escrow. This cannot be the case. It is conceivable, and highly likely, that no money would remain in the Escrow Account on the expiration of the Escrow Period. Indeed, if this had been the case scenario, the Collateral Assignment would not have accomplished anything in terms of safeguarding the Defendants' interest. The Defendants could not and do not claim that the Collateral Assignment changed the provisions of the Escrow Agreement.[4]

The Collateral Assignment, therefore merely documents a transfer in the Debtor's contractually negotiated rights to certain funds, in the event said funds exist. *See, In re Allen*, 888 F.2d 1299 (10th Cir. 1989); *Matter of Van Kylen*, 98 B.R. 455 (Bankr.W.D.Wis.1989). Since a contract right is a general intangible, assignment of that interest can be perfected by filing the appropriate U.C.C. financing statements. *See*, Virginia Commercial Code § 8.9–302. Since neither the Initial Lender nor the Defendants have filed financing statements, perfection of their security interest has not been completed.

An inapposite conclusion was reached by the court in *Matter of O.P.M. Leasing Services, Inc.*, 46 B.R. 661 (Bankr.S.D.N.Y. 1985) which the Defendants cite to in support of their position. That case is distinguishable. First, in *O.P.M.* a sum certain was placed in escrow for the sole benefit of the secured party. In the event of the Debtor's default, the secured party in *O.P.M.*, after following the specified procedure, was entitled to the escrowed funds equal to the default amount. As explained above, in the case *sub judice*, the secured party was never entitled to a specific amount of money. The Defendants could not freeze the activity for which the Escrow Account was created, *i.e.*, the defi-

**3.** Although not raised by the parties, it is questionable whether the Escrow Account in the case *sub judice* is the type which the Debtor does not exert significant control over thereby allowing perfection by notice to the Escrow Agent. *See, Barney v. Rigby Loan & Investment Co.*, 344 F.Supp. 694, 696 (D.Idaho 1972). If the Debtor exerted control over the Escrow Account, possession by the Escrow Agent could not be deemed possession by the secured creditor. However, this Court will not delve into this issue since even if assuming, arguendo, the Debtor is deemed not to exert significant control over the Escrow Account, the outcome of this matter would not be altered.

**4.** Note, the issue as to whether the assignment was intended to last beyond the expiration of the Escrow Period is a separate issue which is addressed next.

ciencies in payment of expenses incurred in the operations of the condominium units, and claim a right to the funds in the Escrow Account at any time before the expiration of the Escrow Period. The interests of the beneficiaries of the Escrow Agreement, which include the Defendants since the operating expenses of the Condominium extended to the debt service, are superior to that of the Defendants under the Collateral Assignment. The element of uncertainty inherent in the Escrow Agreement and the Collateral Assignment works against deeming the interest an interest in money.[5]

### D. *Entitlement to the Escrow Funds*

■ This Court's analysis could end here; nevertheless, we will address the second issue. Issues arising with respect to contractual interpretation are resolved with reference to state law. *See, Shaw v. Dawson,* 48 B.R. 857, 861 (D.N.M.1985). Under Virginia law, which controls in this case, escrow agreements are treated as contracts between the parties. *1616 Reminc Ltd. Partnership v. Commonwealth Land Title Ins. Co.,* 778 F.2d 183, 186 (4th Cir. 1985). When resolving a conflict over a disputed escrow agreement a court will ordinarily be confined to analysis of the document itself. *See, Commonwealth Land Title Ins. Co. v. 1616 Limited Partnership,* 13 B.R. 948 (Bankr.E.D.Va.1981).

■ The laws of the State of Virginia provide that parol evidence is inadmissable to vary or explain the terms of an unambiguous contract. *In re O'Neill Enterprises, Inc.,* 11 B.R. 711, 715 (Bankr.W.D.Va.1981) (citing *Michie's Jurisprudence Evidence,* § 130); *Globe Iron Const. Co. v. First National Bank of Boston,* 205 Va. 841, 140 S.E.2d 629, 633 (1965). The Virginia courts

adhere to the "plain meaning rule", which dictates looking to the words contained in the written agreement in order to effectuate the intentions of the parties. *Amos v. Coffey,* 228 Va. 88, 320 S.E.2d 335, 337 (1984).

■ Pursuant to the express terms of the Escrow Agreement, the Debtor was entitled to the remaining funds in the Escrow Account upon the expiration of the Escrow Period. The Collateral Assignment was created in order to protect the Initial Lender's interest pursuant to the Notes and Deeds of Trust. The Notes and Deeds of Trust were originally due to expire on June 22, 1989, the same time the Escrow Period expired, but, unlike the Escrow Agreement, the Notes and Deeds of Trust were subject to renewal by the parties. The Collateral Assignment provides that it was to expire when each and every Deed of Trust was released and properly recorded. At first blush, this aspect of the Collateral Agreement seems to create an ambiguity which could only be resolved through an evidentiary hearing. However, when taking a closer look at the Collateral Assignment and when attempting to interpret that document along with the Escrow Agreement, a very logical conclusion can be reached which does not work to invalidate any of the provisions of either of the agreements.

The Collateral Assignment assigns to the Initial Lender the Debtor's rights to receive the remaining funds in the Escrow Account, which rights were established pursuant to the Escrow Agreement. While the Collateral Assignment states that it was to terminate upon the release of each and every Deed of Trust, this date was clearly an alternative termination date, in addition

---

**5.** In *In re Nichols,* 88 B.R. 871 (Bankr.C.D.Ill. 1988), the court, when confronted with a very similar issue, held that whether the secured party was a party to the escrow agreement is not controlling in the determination of when perfection of an assignment of interest in escrowed funds has occurred. *Id.* at 876. The *Nichols* court, however, did not discuss what kind of interest was assigned, rather it seems to assume that it was an interest in money which can be perfected by notice to the escrow agent.

This Court is not stating that the fact that the Initial Lender was not a party to the Escrow Agreement is determinative of the kind of interest transferred. Instead, this Court has taken a close look at what exactly the Defendants have been assigned. Unlike in the instant case, in *Nichols* the secured party was granted an assignment of the debtor's rights to a stream of regular payments over the life of the escrow agreement.

to the termination dates provided in the Escrow Agreement. If the case were intended to read otherwise there would be too many questions left unresolved. What was to happen to funds remaining in the Escrow Account as of the termination date of the Escrow Agreement if on that date, as was the case, the Debtor was not in default of its obligations under the Notes and Deeds of Trust and the Notes and Deeds of Trust were renewed by the parties? Was the money to stay in the same Escrow Account and managed by the same escrow agent until such time as the Deeds of Trust were finally released? Or, was the Debtor to obtain possession of the remaining funds in the Escrow Account and set it aside, since the secured party had a continuing security interest in said funds, until the release of each and every renewed Deed of Trust? The Collateral Assignment does not make mention of the treatment of the funds in the event of the renewal Deeds of Trust. In order to answer these questions this court would have to hear parol evidence and effectively insert additional provisions to the Collateral Agreement.

On the other hand, this Court's interpretation of the Collateral Assignment is consistent with the terms of the other documents. In fact, the Initial Lender, with whom the agreement was made, agrees with this Court. In the United Postal Assignment, the Initial Lender and United Postal made clear their understanding of the Collateral Agreement when they agreed that the assignment "shall terminate on the earlier of (i) the date on which a release of each and every Deed of Trust securing the Notes ... shall have been [properly] recorded ..., (ii) the termination of the Escrow Agreement and the Additional Escrow Agreement." (¶ 3.) The United Postal Assignment served as a means to confirm United Postal's position as successor to the Collateral Assignment. While not controlling in this matter, the United Postal Assignment support's the Debtor's interpretation. In hindsight, the Defendants realize that what they bargained for, *i.e.,* agreeing to stand in the shoes of the Initial Lender, is not what they actually want. This is not to say that the Defendants did not know what they bargained for; rather, the Defendants now realize that they should have asked for more protection than what was granted originally. This Court will not now rewrite the terms of the Collateral Assignment to create a new agreement between the parties.

Moreover, the Collateral Assignment specifically provides that the terms of the Escrow Agreement could only be modified upon the written consent of the secured creditor. According to the pleadings and accompanying documentation to the motion for summary judgment, the secured creditor (neither the Initial Lender nor United Postal) has ever executed any written consent to the modification of the Escrow Agreement. Accordingly, the expiration of the Escrow Period could never have been intended to run until the release of each and every Deed of Trust.

In sum, as of the expiration of the Escrow Agreement, the residual funds in the Escrow Account reverted to the Debtor since, as of that date, the Debtor was not in default of the Notes and Deeds of Trust. Accordingly said residual funds constitute property of the Debtor's estate.

The Debtor is directed to settle an order on five (5) days' notice in accordance with the foregoing.