COURT OF APPEALS OF VIRGINIA

Present:   Judges Beales, Ortiz and Causey
Argued at Lexington, Virginia

ROGER W. WOODY, d/b/a
  SHOWCASE HOME BUILDERS

                                                    MEMORANDUM OPINION* BY
v.        Record No. 0494-22-3                      JUDGE RANDOLPH A. BEALES
                                                    MARCH 7, 2023

LION'S GATE HOME OWNERS
  ASSOCIATION, INC.

              FROM THE CIRCUIT COURT OF MONTGOMERY COUNTY
                            Robert M. D. Turk, Judge

              Brian S. Wheeler (James K. Cowan, Jr.; CowanPerry PC, on briefs),
              for appellant.

              James J. O'Keeffe IV (Joshua C. Johnson; MichieHamlett PLLC,
              on brief) for appellee.


        On appeal, Roger W. Woody, doing business as Showcase Home Builders, challenges a

judgment of the Circuit Court of Montgomery County finding that Woody breached a contract with

the Lion's Gate Home Owners Association, Inc. ("the Homeowners Association") and awarding the

Homeowners Association a total of $360,161.25 in damages.  The Homeowners Association, in

turn, also challenges the trial court's refusal to award it attorneys' fees in accordance with the

contract.

                                    I.  BACKGROUND

        "On appeal, we view the evidence and all reasonable inferences arising therefrom in the

light most favorable to the prevailing party at trial."  *Thorsen v. Richmond Soc'y for the Prevention*

---

        * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

*of Cruelty to Animals*, 292 Va. 257, 280 (2016). Woody, a licensed contractor, planned and developed the Lion's Gate subdivision between 2002 and 2004 on land that he owned in Christiansburg. The subdivision consists of fifty-one single family homes and various common areas.

One of the common areas that Woody designed is a retaining wall that is three hundred feet long by nine feet tall. The retaining wall separates the Lion's Gate subdivision from a Food Lion, a nearby grocery store. In order to design and build the retaining wall, Woody relied on the VERSA-LOK wall design plans. VERSA-LOK design plans are frequently used by civil engineers to build retaining walls and require an engineer to assist in the construction of any retaining wall over four feet tall. However, Woody—who is not an engineer—designed the wall himself (using the VERSA-LOK plan) without the assistance of an engineer on this particular project. After building the wall, Woody then planted trees in the soil at the top of the retaining wall "to block the view of the Food Lion mall from the houses."

After completing construction of the subdivision in 2004, Woody created the "Lion's Gate Home Owners Association." He then incorporated the Homeowners Association as a Virginia nonstock corporation in 2007. Woody testified that he was in control of the Homeowners Association until December 10, 2014, when he decided to transfer control of the Homeowners Association to the Board of Directors. Woody continued to serve on the Board of Directors of the Homeowners Association until November 1, 2017, when he and his wife resigned from their positions.

While creating the Homeowners Association, Woody authored and executed the "Declaration of Rights, Covenants, Restriction, Conditions and Obligations of Lion's Gate Home Owners Association, Inc." ("the Declaration") on August 4, 2004. The Declaration sets forth the rights and obligations between the Lion's Gate homeowners ("Owners"), the Homeowners

Association, and the "Declarant/Developer" ("Roger W. Woody, t/a Showcase Home Builders"). Notably, Article IV, Section 2 of the Declaration provides in pertinent part that "the Declarant/Developer shall have the absolute and unilateral right to transfer all common areas" and that "the association shall be required to accept the same and receive the Property transfer whether it be real or personal provided that such Property be in usable condition and in reasonable good working order with allowances of normal and ordinary wear and tear without further claim against the Declarant/Developer or successors or assigns."

On December 10, 2014, the same day that Woody transferred control of the Homeowners Association, Woody exercised his absolute and unilateral right in Article IV, Section 2 of the Declaration to transfer title of the common areas—which included the retaining wall—to the Homeowners Association via a quitclaim deed.

On November 1, 2017, Woody and his wife decided to resign from the Board of Directors. That same month, the Homeowners Association discovered that a large sinkhole had opened on the top of the retaining wall. The Homeowners Association hired Ronald Fink, an engineer who testified at trial as an expert in civil engineering and in the design of retaining walls, to assess the damage to the retaining wall and the surrounding area. Fink testified that the sinkhole was approximately the size of "the front end of a large truck." He described how water would gush out of the side of the retaining wall when it rained and explained that the wall began to bend out toward the homes of the subdivision. Fink reported his findings to the Homeowners Association and stated that "it is inevitable that a failure to the wall will occur unless preventative measures are employed." In his report, Fink concluded that the inadequate internal drainage system, the inadequate surface water runoff system, and the excessive pressure from the trees on top of the wall caused it to fail. At trial, Fink testified that "just in simple terms, this is a disaster."

Joseph Miller, an expert in construction, testified that not only was the wall's drainage system insufficient but also that the wall was actually constructed in a way that made it tilt unevenly. Miller explained that the structural problems with the retaining wall are so pervasive that the entire wall needs to come down. Woody's own expert in construction, Nicholas Thomas, even testified that Woody should have hired an engineer to assist with the construction and that Woody should not have planted the trees on top of the retaining wall.

The current president of the Homeowners Association's Board of Directors, Nathan O'Dell, testified that no one from the Homeowners Association knew about the wall's structural defects until the sinkhole appeared in 2017. Fink corroborated O'Dell's testimony by stating that the wall's design flaws would not have been visible prior to the emergence of the sinkhole.

At a board meeting on October 24, 2018, Fink reported to the Board of Directors that he had received bids from contractors who could repair the wall with prices ranging from $226,830 to $302,550. Although Woody did not personally attend this meeting, Showcase Home Builders's accountant, Jim Wesel, attended as Woody's representative. The Homeowners Association asked Wesel if Woody would help pay for the repairs to the retaining wall, but Wesel could not give the Homeowners Association a definitive answer at that time. During the Homeowners Association's annual members meeting on November 15, 2018, where Woody again sent Wesel as his personal representative, the meeting minutes indicate that the Board "decided to inquire with an attorney about pursuing litigation." Later that evening, Wesel emailed Woody and said, "The directors voted to both ask you if you would be willing to pay to replace the wall and, if they don't hear from you by the attorney's 11/30/18 deadline, to pursue a lawsuit." After the annual meeting, a notice was emailed to all Lion's Gate homeowners that the Homeowners Association had voted to sue Woody.

The November 30, 2018 deadline passed without word from Woody. Consequently, the Homeowners Association filed suit on December 11, 2018, arguing that Woody breached the

Declaration by failing to deliver the retaining wall "in usable condition and in reasonable good working order" as required under Article IV, Section 2 of the Declaration. Given that Woody continues to own a home in Lion's Gate, the Homeowners Association also sought "reasonable attorneys' fees" under Article XI, Section 1(c) of the Declaration which states that "[i]n any proceeding arising out of any alleged default by an Owner, the Declarant/Developer or the Association if it prevails shall be entitled to recover the costs of the proceeding, and such reasonable attorneys' fees as may be determined by the court." Woody filed two pleas in bar arguing that the Homeowners Association had waived its right to sue Woody and that the Homeowners Association's decision to sue Woody was an ultra vires action.

After hearing the evidence and viewing the retaining wall in person, the trial judge issued a letter opinion denying Woody's pleas in bar. The trial court then found that Woody breached the Declaration because the retaining wall "was not in reasonably good working order at the time of transfer in 2014" because it had been defectively constructed, and the trial court awarded a total of $360,161.25 to the Homeowners Association. The trial court, however, then granted summary judgment in favor of Woody on the attorneys' fees issue, awarding no attorneys' fees to the Homeowners Association.

## II. ANALYSIS

### A. Woody's Breach of Article IV, Section 2 of the Declaration

On appeal, Woody argues that the trial court erred in finding him in breach of contract. Specifically he argues that he "was not obligated under the Declaration to transfer the Wall in reasonable working order and usable condition."

#### 1. Woody's Contractual Obligations Under the Declaration

In order to determine Woody's contractual obligations, we must interpret Article IV, Section 2 of the Declaration. "We review issues of contract interpretation de novo." *Bailey v. Loudoun*

*Cnty. Sheriff's Off.*, 288 Va. 159, 169 (2014).  The Supreme Court has consistently held that "[w]e adhere to the 'plain meaning' rule in Virginia: '[W]here an agreement is complete on its face, is plain and unambiguous in its terms, the court is not at liberty to search for its meaning beyond the instrument itself.'"  *Berry v. Klinger*, 225 Va. 201, 208 (1983) (second alteration in original) (quoting *Globe Co. v. Bank of Boston*, 205 Va. 841, 848 (1965)).  "When determining a contract's plain meaning, the words used are given their usual, ordinary, and popular meaning."  *Pocahontas Mining LLC v. Jewell Ridge Coal Corp.*, 263 Va. 169, 173 (2002).  In addition, "'no part' of a contract 'should be discarded as superfluous or meaningless.'"  *Sweely Holdings, LLC v. SunTrust Bank*, 296 Va. 367, 380 (2018) (quoting *CNX Gas Co. v. Rasnake*, 287 Va. 163, 168 (2014)).  "Contracts are construed as written, without adding terms that were not included by the parties."  *TM Delmarva Power, L.L.C. v. NCP of Va. L.L.C.*, 263 Va. 116, 119 (2002).  "In the event of an ambiguity in the written contract, such ambiguity must be construed against the drafter of the agreement."  *Martin & Martin, Inc. v. Bradley Enters., Inc.*, 256 Va. 288, 291 (1998).

Article IV, Section 2 of the Declaration states:

> The Declarant/Developer shall have the *absolute* and unilateral right to transfer all common areas, common amenities or any other Property within the development to the Association.  Upon such tender of transfer, which shall be free and clear of any liens or encumbrances, the [A]ssociation shall be required to accept the same and receive the Property transfer whether it be real or personal provided that such Property be in usable condition and in reasonable good working order with allowances of normal and ordinary wear and tear without further claim against the Declarant/Developer or successors or assigns.

(Emphasis added).

Woody argues that "Article IV, Section 2 of the Declaration contains a condition precedent that, if the Wall was not in reasonable working order and usable condition at the time Mr. Woody sought to effect the transfer of the Common Areas, then, and only then, the Association could refuse to accept the transfer of the property."  However, when interpreting contracts "the law generally

- 6 -

does not favor conditions precedent." *Standefer v. Thompson*, 939 F.2d 161, 164 (4th Cir. 1991) (interpreting Virginia contract law). Furthermore, interpreting a condition precedent into Article IV, Section 2 of the Declaration would render certain words of the Declaration meaningless and it would add language that is not expressly stated in the text itself. *See Rasnake*, 287 Va. at 168; *TM Delmarva Power, L.L.C.*, 263 Va. at 119.

Article IV, Section 2 of the Declaration gives Woody "the *absolute* and unilateral right to transfer all common areas." (Emphasis added). If the Homeowners Association can condition or limit the transfer of the common areas in any way, then Woody no longer has an absolute right to transfer the property because his right is no longer unconditional. *See Absolute*, *Black's Law Dictionary* (11th ed. 2019) ("Free from restriction, qualification, or condition."); *Absolute*, *Webster's Third New International Dictionary* (1981) ("free from conditional limitation"). As such, Woody's interpretation would render the word "absolute" meaningless.

In addition, Woody's interpretation of the Declaration would add language that is not included in the text of the Declaration by imposing a duty on the Homeowners Association to inspect all of the common areas prior to acceptance. *See TM Delmarva Power, L.L.C.*, 263 Va. at 119 ("Contracts are construed as written, without adding terms that were not included by the parties."). Woody contends that "the burden under the Declaration was placed expressly upon the Association to make its own investigation should it have wished to reject a transfer of the Common Areas where the Wall is located." However, nothing in the text of the Declaration expressly provides that the Homeowners Association must inspect all of the common areas to determine whether such areas are "in usable condition and in reasonable good working order" prior to its acceptance of the common areas. By reading in a provision requiring the Homeowners Association to do something other than accept the transfer of the common areas, Woody's interpretation would add language that does not expressly appear in the text itself.

Furthermore, even if the Declaration were ambiguous, any ambiguity must be read against the Declaration's author—Woody. *See Martin & Martin, Inc.*, 256 Va. at 291. Woody drafted the Declaration and is the only party who signed the Declaration. In fact, when the Declaration was executed on August 4, 2004, Woody was in control of the Homeowners Association (and he remained in control of the Homeowners Association until December 10, 2014—the day he transferred the common areas to the Homeowners Association). Therefore, if Woody intended to create an unambiguous condition precedent, then he should have done so when he drafted the Declaration. Instead, Woody authored an agreement which clearly gave him the duty to transfer the common areas "in usable condition and in reasonable good working order."

In contrast, the Homeowners Association's interpretation of the Declaration comports with a plain reading of the entire text of the Declaration, and its interpretation does not add any language that is not expressly stated in the text. Under the Homeowners Association's interpretation, Woody has the absolute right to transfer the common areas, and the Homeowners Association must accept the common areas when Woody exercises his transfer right. After accepting the common areas, the Homeowners Association can seek redress against Woody if he failed to transfer the common areas "in usable condition and in reasonable good working order." In short, the Homeowners Association cannot prevent or limit Woody from exercising his absolute right to transfer the common areas to the Homeowners Association. At the same time, the Homeowners Association has the authority to seek redress against Woody only if he failed to deliver the common areas "in usable condition and in reasonable good working order"—as is the case here.

Given that the Declaration created a contractual obligation—not a condition precedent—the Homeowners Association did not waive its claim against Woody after it promptly sued Woody for breaching the Declaration after the sinkhole appeared. *See Horton v. Horton*, 254 Va. 111, 117 (1997) ("Acceptance of defective performance, without more, does not prove intent to relinquish the

right to full performance."); *Hall v. MacLeod*, 191 Va. 665, 673 (1950) (finding that a party did not waive a breach of contract claim against a contractor by accepting and using a defectively designed barn). Woody had a contractual obligation to provide a retaining wall "in usable condition and in reasonable good working order," and the Homeowners Association timely filed suit alleging that Woody failed to uphold this obligation. Consequently, the trial court did not err in denying Woody's "Plea in Bar of Waiver."[1]

### 2. *The Trial Court's Findings of Fact*

Woody further argues that "the Association failed to meet its burden of proof to demonstrate that the Wall was not 'in usable condition and in reasonable good working order' when it was transferred in 2014." "The trial court heard the evidence *ore tenus* and viewed the area involved. Therefore, its decree is entitled to the same weight as that which attaches to a jury verdict and is binding upon us unless it is plainly wrong or without evidence to support it." *Burns v. Winchester Mem'l Hosp.*, 225 Va. 545, 550 (1983).

In its letter opinion, the trial court concluded that the Homeowners Association "has met its burden in demonstrating that while the retaining wall may have been usable for its intended purpose, *it was not in reasonably good working order* at the time of transfer in 2014." (Emphasis

---

[1] At oral argument, Woody's counsel argued for the first time that the Homeowners Association's interpretation of the Declaration would "create a fourteen-year statute of repose" which would contravene Code § 8.01-250. *But see id.* (prohibiting recovery "for any injury to property, real or personal, or for bodily injury or wrongful death, arising out of the defective and unsafe condition of an improvement to real property" which occurs "five years after the performance or furnishing of such services and construction"). Given that this argument was raised for the first time during oral argument before this Court, it was not preserved for appeal. Rule 5A:18; Rule 5A:20. Therefore, this Court will not address it on appeal. *See, e.g.*, *Stokes v. Commonwealth*, 61 Va. App. 388, 397 (2013) ("[T]his Court will not consider an argument presented for the first time at oral argument." (citing *Va. Dep't of State Police v. Barton*, 39 Va. App. 439, 447 (2002))). Regardless, Code § 8.01-250 would not apply here in this situation because this case involves an action for breach of contract and "Code § 8.01-250 is only applicable to those *torts* specified in the statute." *Tate v. Colony House Builders, Inc.*, 257 Va. 78, 85 (1999) (emphasis added).

added).  Ultimately, the trial court determined that "the evidence demonstrates that the issues relating to the retaining wall originate from the wall's inception."  The trial judge viewed the wall himself, viewed photographs of water gushing out of the wall during a rainstorm, and heard evidence from an expert in engineering and two experts in construction to come to this conclusion.

At trial, two experts testified that the wall was inadequately designed and constructed.  All three experts testified that Woody should not have planted trees on top of the retaining wall and that Woody should have hired an engineer to assist in the design and construction of the wall.  Ronald Fink, an expert in civil engineering and in the design of retaining walls, testified that the retaining wall was defectively designed because of its inadequate internal drainage system, its inadequate water runoff system, and the excessive pressure caused by the trees planted near the top of the wall.  Joseph Miller, an expert in construction, testified that the wall was built unevenly.  In addition, Woody's own construction expert, Nicholas Thomas, corroborated Fink's conclusion that Woody should not have planted trees on top of the retaining wall and testified that Woody should have hired an engineer to assist with the wall's construction.  Clearly, the evidence in the record supports the conclusion that the wall was defectively designed and constructed.

Consequently, given this expert testimony, the photographic evidence presented, and the trial judge's own observations of the wall, we certainly cannot say that the trial court was plainly wrong or without evidence in finding that the retaining wall was not "in usable condition and in reasonable good working order" at the time of transfer in 2014.

Therefore, the trial court also did not err in concluding that Woody was in breach of contract when he defaulted on his duty to transfer the common areas "in usable condition and in reasonable good working order" by delivering a defectively designed and constructed retaining wall.

### B. The Homeowners Association's Decision to Sue Woody

Woody argues that the Homeowners Association's "complaint is a legal nullity and void as a matter of law because it was an unauthorized *ultra vires* action." When a corporation acts "beyond the powers conferred upon it by the legislature," then the corporation's act is ultra vires. *Princess Anne Hills Civic League, Inc. v. Susan Constant Real Estate*, 243 Va. 53, 61 (1993). If a corporation acts in an ultra vires fashion, then the action is "wholly void and of no legal effect." *Id*. In contrast, when a corporation acts pursuant to its statutory authority but "merely failed to do properly what it had the power to do," then the action is voidable and is subject to ratification. *Id*.; *see also Kappa Sigma Fraternity, Inc. v. Kappa Sigma Fraternity*, 266 Va. 455, 467 (2003).

Code § 13.1-826(A)(1) authorizes a nonstock corporation to sue in its corporate name. Given that the Homeowners Association is a nonstock corporation and that it sued Woody in its corporate name, the Homeowners Association acted within its statutorily authorized powers when it sued Woody. Consequently, the Homeowners Association's action was not ultra vires.

Furthermore, the record clearly shows that the Homeowners Association acted in accordance with its bylaws when it voted to sue Woody before filing a complaint against him. The minutes from the annual meeting held on November 15, 2018, show that "the Board decided to inquire with an attorney about pursuing litigation." Jim Wesel, Woody's personal representative who attended that meeting, emailed Woody afterward and stated, "The directors *voted* to *both* ask you if you would be willing to pay to replace the wall *and*, if they don't hear from you by the attorney's 11/30/18 deadline, to pursue a lawsuit." (Emphases added). When the Board did not hear from Woody by its deadline, the Homeowners Association filed suit. Given that the Homeowners Association voted to sue Woody pursuant to its statutorily prescribed power to sue

- 11 -

under Code § 13.1-826(A)(1), we cannot say that the trial court erred in denying Woody's "Plea in Bar of *Ultra Vires* Action."

### C.  The Homeowners Association Is Entitled to Attorneys' Fees

In the Homeowners Association's assignment of cross-error, it argues that "the trial court erred by granting Woody's motion for summary judgment on the Association's claim for attorney fees" under Article XI, Section 1(c) of the Declaration.

Determining whether Article XI, Section 1(c) of the Declaration entitles the Homeowners Association to attorneys' fees requires us to interpret the terms of a contract, the Declaration, "which this Court reviews de novo." *Online Res. Corp. v. Lawlor*, 285 Va. 40, 61 (2013).  "The contract must be read as a single document.  Its meaning is to be gathered from all its associated parts assembled as the unitary expression of the agreement of the parties." *Berry*, 225 Va. at 208.  "Courts will not rewrite contracts; parties to a contract will be held to the terms upon which they agreed." *Bank of Southside Va. v. Candelario*, 238 Va. 635, 640 (1989).

Article XI, Section 1(c) of the Declaration states that "[i]n any proceeding arising out of any alleged default by an Owner, the Declarant/Developer or the Association if it prevails shall be entitled to recover the costs of the proceeding, and such reasonable attorneys' fees as may be determined by the court."  A plain reading of the entire contract shows that it is irrelevant whether the Homeowners Association sued Woody as an Owner or as the Declarant/Developer because the Declarant/Developer is in this case, by definition, an Owner.  Definition (j) of the Declaration states that "'Owner' or 'Home Owner' or 'Lot Owner' shall mean and refer to the fee simple record Owner, whether one or more persons or entities or *the Declarant/Developer*, of the fee simple title to any residential home."  (Emphasis added).  According to the Declaration, Woody is the Declarant/Developer.  In addition, Woody then testified at trial that he is still a homeowner within the Lion's Gate subdivision.  Given that Woody is the Declarant/Developer and that he owns a

home within the Lion's Gate subdivision, Woody is an Owner under the plain terms of the Declaration. As Woody remains an Owner in the subdivision, the Homeowners Association is entitled to recover attorneys' fees if it prevails "[i]n any proceeding arising out of any alleged default by" Woody—or any other Owner for that matter.

Given that Woody—an Owner—defaulted by breaching Article IV, Section 2 of the Declaration and given that the Homeowners Association prevailed in its suit against Woody, the Homeowners Association is "entitled to recover the costs of the proceeding, and such reasonable attorneys' fees as may be determined by the court." Consequently, the trial court erred in granting Woody's "Motion for Summary Judgment" seeking the denial of attorneys' fees to the Homeowners Association. We therefore reverse the trial court on this assignment of error and remand to that court for it to award reasonable attorneys' fees to the Homeowners Association and also the costs incurred by the Homeowners Association while in the proceedings before the trial court.

### III. CONCLUSION

In short, Woody had the contractual obligation to transfer the common areas "in usable condition and in reasonable good working order." Consequently, the trial court did not err in finding that Woody breached the Declaration when he delivered a defectively designed and constructed retaining wall. Given that the Homeowners Association timely filed suit against Woody for this breach of contract, the Homeowners Association did not waive its right to seek redress against Woody. Furthermore, the Homeowners Association's decision to file suit against Woody was properly authorized by statute and was properly voted on by its Board of Directors. Finally, given that the Homeowners Association prevailed against Woody (an Owner) at trial, the trial court erred in refusing to award reasonable attorneys' fees under the plain language of the Declaration. Therefore, for all of these reasons, we affirm the trial court's decision regarding Woody's liability

- 13 -

for breach of contract, but we reverse the trial court on its refusal to award reasonable attorneys' fees to the Homeowners Association. We remand to the trial court for a determination of reasonable attorneys' fees and the costs incurred during the proceedings in the trial court, under the terms of the Declaration and consistent with this opinion.

*Affirmed in part, and reversed and remanded in part.*