**In re VIENNA PARK PROPERTIES, a Limited Partnership, Debtor.**

Nos. 91 Civ. 1927 (LBS),
91 Civ. 4230 (LBS).

United States District Court,
S.D. New York.

Jan. 24, 1992.

Glass & Eckstein, P.C. by Tenzer, Greenblatt, Fallon & Kaplan, New York City (Andrew B. Eckstein, Glen D. Rubin, Harris N. Cogan, Fredda L. Plesser, of counsel), for debtor.

Stroock & Stroock & Lavan, New York City (Robert Lewin, Fred Hodara, Joseph J. Giamboi, John F. Sylvia, of counsel), for Secured Creditors Trust Bank Sav., F.S.B. and United Postal Sav. Ass'n.

SAND, District Judge.

In these appeals, The Resolution Trust Corporation, as conservator of Trustbank Federal Savings Bank ("Trustbank"), and United Postal Savings Association ("United Postal") (collectively, "the Secured Creditors" or "the Banks") appeal from two separate orders of the Bankruptcy Court for the Southern District of New York (Blackshear, B.J.). The first order, entered November 6, 1990, denied the Secured Creditors' Motion for Sequestration of Cash Collateral and Adequate Protection which had sought the turnover of all rental income generated by the real property and sole asset of Vienna Park Properties ("Vienna Park" or "Debtor"). The second order, entered March 5, 1991, granted the Debtor's Motion for Summary Judgment declaring that certain escrow funds constituted the property of the Debtor's estate free and clear of the Secured Creditors' asserted liens. 135 B.R. 739.[1]

This court has jurisdiction to hear the instant appeals pursuant to 28 U.S.C. § 158(a). For the reasons that follow, we reverse the bankruptcy court's order re-

---

1. Initially, only the appeal involving the escrow fund was before us. Following oral argument of that appeal, it became clear that certain findings of fact made by Judge Blackshear in the cash collateral decision, which was on appeal before Judge Freeh, were potentially relevant to our resolution of the escrow appeal. In light of that overlap and the fact that oral argument on the cash collateral appeal had not yet been heard before Judge Freeh, we agreed to accept that appeal as well.

garding cash collateral, and affirm the order regarding the escrow funds.

## I. BACKGROUND

The background to these appeals is quite complex, requiring a detailed examination of the agreements giving rise to the parties' claims and the decisions of the bankruptcy court. Most of the facts underlying the appeals were summarized in the decisions below. *See In re Vienna Park Properties,* 112 B.R. 597 (Bankr.S.D.N.Y.1990) (hereinafter *"Cash Collateral Opinion I"*), *vacated, In re Vienna Park Properties,* 120 B.R. 332 (Bankr.S.D.N.Y.1990) (hereinafter *"Cash Collateral Opinion II"*); *In re Vienna Park Properties,* 135 B.R. 739 (Bankr.S.D.N.Y.1991) (hereinafter *"Escrow Opinion"*). For ease of reference, however, and because some of Judge Blackshear's findings have themselves been challenged on these appeals, the relevant facts are restated herein.

### A. *The Cash Collateral Appeal.*

#### 1. Factual Background.

The Debtor, Vienna Park Properties, is a single asset limited partnership engaged in the business of owning and operating condominium apartments in Vienna, Virginia. In 1984, the Debtor purchased 300 separate condominium units from Vienna Park Associates. To finance the acquisition, the Debtor executed 300 first Deeds of Trust Notes (the "Notes") in favor of Congressional Mortgage Company ("Congressional" or "the Initial Lender"), and secured each note with a separate Deed of Trust (the "Deeds of Trust"). The Notes, executed on June 22, 1984, were to mature in five years on June 22, 1989, at which time the outstanding principal balance and all accrued but unpaid interest would be due. *See* Cash D–8.[2] An addendum to the Notes, however, stated that the Notes

could be renewed for consecutive two year terms provided the Debtor was not in default under either the Notes or the Deeds of Trust. All 300 Deeds of Trust were duly recorded in Fairfax County, Virginia, the county where the property is located.

Each of the Deeds of Trust[3] contains an "Assignment of Rents" clause (the "Assignment of Rents") which provides in pertinent part:

As additional security hereunder, Borrower [Debtor] hereby assigns to Lender the rents of the Property, provided that Borrower shall, prior to acceleration under paragraph 18 hereof or abandonment of the Property, have the right to collect and retain such rents as they become due and payable.

Upon acceleration under paragraph 18 hereof or abandonment of the Property, Lender, in person, by agent or by judicially appointed receiver, shall be entitled to enter upon, take possession of and manage the Property and to collect the rents of the Property, including those past due.

Deed of Trust ¶ 20, Cash D–9.

The Deeds of Trust also contain a clause entitled "Remedies Cumulative," which states:

All remedies provided in this Deed of Trust are distinct and cumulative to any other right or remedy under this Deed of Trust or afforded by law of equity, and may be exercised concurrently, independently or successively.

*Id.* ¶ 12.

On August 6, 1984, Congressional assigned 162 of the Deeds of Trust and Notes to United Postal. In January 1985, Congressional assigned the remaining 138 Deeds of Trust and Notes to Trustbank.

As described above, the Notes were to mature on June 22, 1989 unless they were

---

**2.** Citations to the record have been abbreviated as follows: citations preceded by "Cash D–_" refer to documents in the Designation of Record filed with the Court in connection with the cash collateral appeal; those preceded by "Counter Cash D–_" refer to documents in the Counter–Designation of Record filed by the Debtor in connection with the cash collateral appeal; and

those preceded by "Escrow D–_" refer to documents in the Designation of Record filed in connection with the escrow appeal.

**3.** Each Deed of Trust and Note contains identical provisions except for the condominium unit number and dollar amount.

renewed pursuant to the renewal option set forth in the addendum to the Notes. Whether renewal was accomplished before June 22, 1989 is difficult to ascertain from record, and Judge Blackshear's findings with respect to renewal are themselves unclear.[4] Our own recitation of the facts surrounding renewal is therefore appropriate, although our ultimate disposition of the appeals renders the date of default inconsequential.

In the weeks preceding June 22, 1989, the Debtor indicated its interest in renewing the Notes, *see, e.g.,* Letter from Debtor to Banks Dated May 1, 1989 (Counter Cash D–3, exh. G), and both Banks responded by stating the terms upon which they would consent to renewal. *See* Letter from Trustbank to Debtor dated May 10, 1989; Letter from United Postal to Debtor dated May 24, 1989; Letter from Trustbank to Debtor dated June 5, 1989 (Counter Cash D–3, exh. H). Apparently because the parties were actively engaged in renewal negotiations, the Debtor ignored the original maturity date and did not pay the principal and accrued interest that was due on June 22, 1989.

By letter dated July 7, 1989 ("the Letter of Agreement"), United Postal and the Debtor entered into an agreement for renewal of the Notes (Cash D–6, exh. H). The Letter of Agreement called for the parties' joint retention of Virginia counsel to draft the documents and required the Debtor, among other things, to provide United Postal with a plan to obtain either alternate financing or a joint venture partner by July 25, 1989. Neither of those steps was completed. In addition, while Debtor did send United Postal the payment of accrued interest due July 1, 1989, no further payments were made after that date. As a result, by letter dated August 10, 1989, United Postal notified the Debtor that it was in default under the Letter of

Agreement and that it would accelerate the indebtedness if the default was not cured within thirty days (Cash D–11). By letter dated September 19, United Postal declared the loans accelerated (Cash D–13). Finally, by letter dated October 30, 1989, United Postal notified Grady Management, Inc., the manager of the condominium units, of its demand for the rents from the 162 units securing its indebtedness under the Deeds of Trust.

With respect to the 138 Notes held by Trustbank, following negotiations, Trustbank proposed an offer to renew the Notes. *See* Letters from Trustbank to Debtor dated July 3, 1989 and July 27, 1989 (Cash D–6, exhs. I & J). The offer was to expire on August 31, 1989, and was conditioned on the Debtor's making the July 1, 1989 payment covering the accrued June interest, the August 1, 1989 payment, and continued compliance with required escrow payments. Neither the July 1 nor the August 1 payment was received by Trustbank, and by letter dated August 10, 1989, Trustbank notified the Debtor's General Partner that the Debtor did not meet the conditions of renewal (Cash D–16, exh. I). By letter dated October 30, 1989, Trustbank sent a letter to Grady Management demanding rents received from the 138 condominium units securing its indebtedness under the Deeds of Trust.

In late October 1989, both United Postal and Trustbank commenced foreclosure sale proceedings on the Debtor's property. Those proceedings were stayed on November 21, 1989 (the "Petition Date") when the Debtor filed a petition for reorganization under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.* (hereinafter the "Code").

### 2. Procedural Background.

On December 29, 1989, the Secured Creditors filed a Motion for Sequestration of

---

**4.** In *Cash Collateral Opinion I,* Judge Blackshear made the following findings regarding renewal: with respect to the United Postal Notes, the parties "entered into an agreement for renewal" but "renewal was never completed"; with respect to Trustbank, "the Notes were never renewed and matured as of June 22, 1989." 112 B.R. at 598. In *Cash Collateral Opinion II,* de-

spite the bankruptcy court's express statement that the "facts in [*Cash Collateral Opinion I*] are incorporated by reference ... since said facts have not changed," 120 B.R. at 335, Judge Blackshear states that "Trustbank's notes ... were renewed pursuant to the[ir] terms" and that no default occurred on June 22, 1989. *Id.* at 338.

Cash Collateral pursuant to §§ 363(c), 363(e) and 361 of the Code, seeking a determination that the rental income flowing from the Debtor's real property was cash collateral subject to the security interest under the Assignment of Rents provision in the Deeds of Trust. *See* Cash D–2. The Secured Creditors also filed a "Notice of Fixing of Inchoate Lien and/or Perfection" pursuant to § 546(b)[5] of the Code. Cash D–4.

*Cash Collateral Opinion I.*

In its decision dated April 10, 1990, the bankruptcy court reviewed the Assignment of Rents clause and Virginia law to determine the parties' rights in the rental income. After finding that the Assignment of Rents was absolute, and that Virginia is among "the minority of states which subscribes to the 'title theory,'" the court concluded that a mortgagee has "an absolute right to possession of the encumbered property as well as to rents, and issues and profits immediately upon default by the mortgagor" without taking any additional steps to enforce its interest. *Cash Collateral Opinion I*, 112 B.R. at 599. The court therefore held that the rents collected by the Debtor were cash collateral and that the Secured Creditors were entitled to them as of the date of the Debtor's default on the loans. *Id.* at 600.

*Cash Collateral Opinion II: Judge Blackshear's Sua Sponte Vacatur.*

Some six months later, in an opinion dated October 23, 1990, the bankruptcy court *sua sponte* vacated its initial decision on the cash collateral issue. The court first noted that there was "room to doubt" its previous finding that Virginia is a title theory state, but then concluded that regardless of whether Virginia is a title or lien theory state, an absolute assignment of rents clause confers upon a secured party the right to rents upon default without

any further action. *Cash Collateral Opinion II*, 120 B.R. at 336–37. Where the assignment of rents clause uses language that is not absolute, however, but rather indicates the intention of the parties to create an additional security interest, Virginia caselaw requires the secured party to be in possession of the property before they become entitled to any rental proceeds. To determine whether an assignment of rents provision is absolute or intended as additional security, Judge Blackshear found that the court should look to the language of the clause itself. *Id.* at 337.

Scrutinizing the assignment of rents provision at issue, the bankruptcy court revised its initial conclusion that the assignment was absolute, and instead held that language such as "as additional security" indicated that the provision was intended to give the secured parties a mere lien in the rental proceeds. The court observed that the clause itself required certain steps as a precondition to entitlement, such as acceleration of the debt and the taking of possession, and held that since the Secured Creditors had not taken those steps prior to the Petition Date, their interest in the rental proceeds was not "perfected" at that time. *Id.* at 338.

Having rejected the Secured Creditors' argument that they were entitled to the rents pre-petition, the court next addressed their claim that they perfected their interest in the rents subsequent to the Petition Date under § 546(b) of the Code. Judge Blackshear rejected this argument as well, concluding that § 546(b) applies only to situations where a state statute permits a post-petition act of perfection to "relate back" to a time pre-petition, and that no such statute existed under Virginia law. *Id.* at 338–340. This second decision was embodied in the order, entered November

---

5. Section 546(b) provides:
   The rights and powers of a trustee under sections 544, 545 and 549 of this title are subject to any generally applicable law that permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of such perfection. If such law requires seizure of such property or commencement of an action to accomplish such perfection, and such property has not been seized or such action has not been commenced before the date of the filing of the petition, such interest in such property shall be perfected by notice within the time fixed by such law for such seizure or commencement.

6, 1990, from which the Secured Creditors now appeal.

*The Application for a Stay Pending Appeal.*

On November 15, 1990, the Secured Creditors moved by order to show cause for a stay of the order pending appeal. After a hearing on November 27, 1990, Judge Blackshear granted the Secured Creditors' motion. The rental proceeds are currently being held in an interest-bearing escrow account pending the resolution of this appeal.

### B. *The Escrow Appeal.*

#### 1. Factual Background.

This appeal involves the parties' competing claims to funds held pursuant to an escrow agreement dated June 22, 1984. Since their asserted claims grow out of the provisions of several agreements entered into by the instant parties and assorted other parties in interest, the history and relevant aspects of those agreements is summarized below.

*The Purchase Agreement.*

The first document relevant to this appeal is an amended purchase agreement (the "Purchase Agreement") dated June 11, 1984, entered into by Vienna Park Associates (the "Seller"), Michael Gordon and Herbert Luksch (the "Advancing Parties"), and Brookhill Capital Resources, Inc. (the "Purchaser").[6] *See* Escrow D–5, exh. A. In addition to setting forth the terms of the purchase and certain aspects of the financing, paragraph 12 of the Purchase Agreement provides for the establishment of an escrow account to further collateralize the loan of the Initial Lender, Congressional Mortgage Company. The agreement provides that at the closing, an escrow account (the "Escrow Account") would be established in the sum of $2,500,000, of which $2,000,000 was to be paid from the proceeds of the loans and $500,000 was to be contributed by the Purchaser. The purpose of the Escrow Account as stated in the Purchase Agreement was "to establish

funds wherefrom certain operating deficits of the Condominium Project shall be paid," ¶ 12, including the payment of interest on the Notes. ¶ 14.A(ii). The entire Escrow Account was to be "conditionally assigned to [the Initial] Lender." ¶ 12.

*The Escrow Agreement.*

In accordance with the Purchase Agreement, the Debtor entered into a written escrow agreement (the "Escrow Agreement") with the Seller, the Advancing Parties, and the escrow agent Suburban Bank ("Suburban"), pursuant to which $2,000,000 of the loan proceeds and $500,000 of the Debtor's funds were simultaneously placed into the Escrow Account with Suburban Bank. Escrow D–5, exh. B. The purpose of the Escrow Account, as stated in the Escrow Agreement, was to establish a fund "from which to pay certain costs of the Condominium Project as described in the [Purchase Agreement]." The agreement directed the Management Agent to invest the funds in "securities issued or guaranteed by United States or state or municipal money market mutual funds, certificates of deposits, commercial paper, other money market instruments, accounts in commercial banks and savings and loan associations, and the like." ¶ 2.

In terms of the mechanics of the Escrow Account, the Escrow Agreement provides as follows:

3. Within ten (10) days following receipt of an Invoice from Management Agent, ... Escrow Agent shall advance the amount specified therein from the Escrow Account first from Purchaser's Contribution and then from the remaining funds in the Escrow Account until the earlier of (a) the date on which no funds remain therein, or (b) the termination of the Escrow Agreement.

¶ 3. The "termination of the Escrow Agreement," in turn, is defined as "the earlier to occur of (a) the fifth anniversary hereof; or (b) the sale, conveyance or transfer of all the Units." ¶ 12.

Finally, and central to the parties' claims on this appeal, paragraph 5(e) provides:

---

**6.** On or about June 22, 1984, Brookhill Capital Resources, Inc. assigned its rights and obli-

gations under the Purchase Agreement to the Debtor.

Upon the earlier to occur of (i) [the sale of the last unit] or (ii) the fifth anniversary hereof, Escrow Agent shall ... disburse to Purchaser the balance of the funds remaining in the Escrow Account prior to such disbursement.

¶ 5(e).

*The Collateral Assignment.*

As additional security for Congressional's loan and in furtherance of the Purchase Agreement, the Debtor, the Management Agent for the property, and Congressional executed an Assignment of Escrow Agreement dated June 22, 1984 (the "Collateral Assignment"). Escrow D–5, exh. D. Pursuant to that agreement, the Debtor and the Management Agent[7] "... agreed to assign their interest in the Escrow Account to Secured Party [Congressional] as security for the repayment of the Notes." The security interest was to become operative "if and to the extent" the Debtor defaulted on its obligations under the Notes or Deeds of Trust, ¶ 1, and further provided:

> Assignors hereby assign to Secured Party *their rights to receive funds now or hereafter deposited in the Escrow Account in accordance with the Escrow Agreement.* This assignment is made as collateral security for the full and prompt payment and performance by Borrower (Debtor) of its obligations under the Notes and Deeds of Trust ...

¶ 1 (emphasis added). According to paragraph 5, the Collateral Assignment was to terminate "on the first date on which a release of each and every Deed of Trust shall have been recorded among the land records of Fairfax County, Virginia." The parties agree that that event has not occurred.

*Congressional's Assignments.*

As related above, on August 6, 1984, Congressional sold 162 of the Notes and Deeds of Trust securing the Debtor's property to United Postal. On January 23, 1985, Congressional sold the remaining 138

of the Notes and Deeds of Trust to Trustbank.

Under Virginia law, a transfer of the secured debt includes the security without the need for a written assignment. *See Escrow Opinion* at 742 n. 1. At the time of the transfer of its interest in the Notes, therefore, Congressional also transferred any interest it held in the Collateral Assignment to United Postal and Trustbank.

While no formal assignment of the Collateral Assignment was necessary, in 1988, Congressional executed an assignment document confirming the assignment of its security interest in the Escrow Account (the "United Postal Assignment"). By its terms, the United Postal Assignment was to terminate on the earlier of: "(i) the date on which a release of each and every Deed of Trust securing the Notes owned by Assignee shall have been recorded among the land records of Fairfax County, Virginia, or (ii) the termination of the Escrow Agreement...."

*Negotiations for Renewal and the Ensuing Dispute.*

At some point prior to the maturity date of the Notes, and while negotiations for renewal were taking place, the Secured Creditors requested an accounting of the Escrow Account to verify that the account had been administered in accordance with the Escrow Agreement. By letter dated June 20, 1989, United Postal notified the Escrow Agent of its security interest in the Escrow Account and requested that no further Escrow Funds be released to the Debtor pending the outcome of an audit. Escrow D–5, exh. G.

While the Debtor and United Postal were negotiating the Letter of Agreement regarding renewal, a dispute arose as to which party was entitled to the balance of the Escrow Account. To temporarily resolve the issue, the parties agreed to transfer the Escrow Funds to the Debtor's counsel, as "Present Escrow Agent," to be held in escrow pending resolution of the claims.

---

7. The Secured Creditor's interest in the Management Agent's rights under the Escrow Agreement are not at issue on this appeal.

*See* Nemens Affidavit ¶ 20, Escrow D–5. The funds remain there pending the outcome of this appeal.

With respect to the actual date of default, the bankruptcy court below found that "As of the maturity date of the Notes, the Debtor was current in its obligations under the Notes," that it exercised its rights to renewal, and that "it was not until subsequent to the Maturity Date that the Debtor defaulted in its obligations to the Defendants." *Escrow Opinion* at 742–43. In stating those findings, however, Judge Blackshear specifically referenced his findings regarding renewal in *Cash Collateral Opinion II*, which, as discussed above, were far from clear.

2. Procedural Background.

On June 29, 1990, the Debtor commenced this action against the Secured Creditors by filing a Complaint. Escrow D–2. The Complaint seeks a declaration that the monies being held in the Escrow Account constitute the Debtor's assets free and clear of the claims of Trustbank and United Postal. On August 27, 1990, the Debtor filed the Motion for Summary Judgment at issue, seeking a declaration that (i) the Secured Creditors do not have security interests in the Escrow Funds, or in the alternative, (ii) that any such security interests were not perfected and are therefore unenforceable. *See* Escrow D–5 & D–6.

Throughout this time period, the Secured Creditors repeatedly sought the opportunity to conduct discovery.[8] In particular, the Secured Creditors sought to depose representatives of the parties to the various agreements at issue, including Congressional, the Management Agent, the Debtor and various attorneys who had drafted the agreements. The Secured Creditors claimed that such discovery was critical because the intentions of the parties were at issue.

The bankruptcy court denied the above requests for discovery, and heard oral argument on the motion on February 13, 1991. On March 5, 1991, Judge Blackshear issued the decision granting summary judgment in favor of the Debtor that is the subject of this appeal. Escrow D–14.

In its decision, the bankruptcy court first found that the Escrow Agreement and the Collateral Assignment were "interdependent and interrelated documents." *Escrow Opinion* at 743. Turning next to the issue of the classification of the security interest in the Escrow Funds, the court rejected the Secured Creditors' claim that it be classified as "money" and instead held that it should be categorized as a "general intangible." Because § 8.9–302 of the Virginia Code requires the filing of a financing statement to perfect an interest in a general intangible, and because it was conceded that the Secured Creditors had not filed such a statement, the court concluded that the funds belonged to the Debtor, free and clear of any interest of the Secured Creditors. *Id.* at 743–45.

Although the bankruptcy court could have ended its analysis there, it next construed the terms of the various agreements to determine whether the Secured Creditors' interest in the Escrow Account survived the termination of the Escrow Agreement. Despite the existence of a different termination provision in the Collateral Assignment and the Secured Creditors' proffer of possible alternative readings of the agreements, the court concluded that "as of the expiration of the Escrow Agreement," which was the earlier of the sale of all the units or June 22, 1989, "the residual funds in the Escrow Account reverted to the Debtor." *Id.* at 746.

## II.  DISCUSSION.

### A.  *The Standard of Review.*

In reviewing the decisions below, this Court is mindful that the bankruptcy court's findings of fact may not be set aside unless clearly erroneous. Its conclusions of law, however, are subject to *de novo* review by the district court. *Brun-*

---

8. The Secured Creditors sought permission to conduct discovery on at least two occasions, at a pre-trial conference before Judge Blackshear on August 7, 1990, *see* Escrow D–4 at 5–8, and in a formal application pursuant to Federal Rule of Civil Procedure 56(f), *see* Escrow D–11.

*ner v. New York State Higher Educ. Serv. Corp.,* 831 F.2d 395, 396 (2nd Cir.1987); *In re O.P.M. Leasing Serv., Inc.,* 79 B.R. 161, 162 (S.D.N.Y.1987).

### B. *The Cash Collateral Appeal.*

Although the parties raise a host of peripheral issues in their briefs, they agreed at oral argument that the "core legal issue" on this appeal is how, or indeed whether, a secured creditor can effectuate its interest in rents under an assignment of rents clause once the defaulting party enters bankruptcy. *See* Transcript of Oral Argument at 37 (October 10, 1991) (hereafter "Transcript"). Not only did the bankruptcy court below render two different answers to that question, but other bankruptcy courts that have addressed the issue have reached varying results or employed varying rationales.

▮ Before turning to the merits of the appeal, we feel that it is important to resolve one definitional issue that appears to have contributed to the confusion in this area of the law: the distinction between "perfection" and "enforcement" [9] of a security interest. A number of courts and commentators have recently emphasized the importance of using the proper terminology, observing:

> "[P]erfection" means the process by which the security interest ... achieves a status where it cannot be avoided by an intervening third party.
>
> .    .    .    .    .
>
> "Perfection" is thus a concept involving the relative interests of the lien-holder and an intervening third party. It does not deal with the relationship between the debtor and the collateral property. Those latter relationships raise only the question of "enforcement" of the security interest.

McCafferty, *The Assignment of Rents in the Crucible of Bankruptcy,* 94 Com.L.J. 433, 471–72 (1989), *cited in In re Park at*

*Dash Point L.P.,* 121 B.R. 850, 853 (Bankr. W.D.Wash.1990) (hereinafter *"Dash Point"*; *see also In re Rancourt,* 123 B.R. 143, 149 n. 4 (Bankr.D.N.H.1991) (hereinafter *"Rancourt"*); *In re Foxhill Place Assoc.,* 119 B.R. 708, 711 (Bankr.W.D.Mo. 1990). As used in this decision, therefore, "perfection" refers to the process by which a secured party puts third-parties on notice of its interest, whereas "enforcement" refers to the steps the secured party must take to realize its rights in the collateral, which in this case is the rental income.

Turning our attention now to the decision in *Cash Collateral Opinion II,* we find that although Judge Blackshear correctly stated the requirements under Virginia law for enforcing an interest in rents pre-petition, he erred in finding that because the rents were not "cash collateral" pursuant to § 363 of the Code they were unenforceable once the Debtor entered bankruptcy. This opinion restates the requirements under Virginia law for perfecting and enforcing a security interest in rents post-petition, and determines whether such rents constitute "cash collateral" pursuant to § 363.

### 1. Validity of the Security Interest in Rents.

▮ As Judge Blackshear correctly noted in the decisions below, the validity of any security interest in rents must be determined by reference to the law of the state in which the real property is located. *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). Since the Debtor's property is located in Virginia, we look to Virginia law to determine the requirements for perfection and enforcement of such a security interest.

### *Perfection of the security interest under Virginia law.*

▮ Although the bankruptcy court found that the Secured Creditors had not

---

9. Instead of distinguishing between "perfection" and "enforcement," the Secured Creditors present the dichotomy as between "perfection" and "entitlement." While we believe that "perfection," which is a notice concept, should be distinguished from "enforcement" or "entitlement," which refer to the steps required to gain present access to the collateral, the terms "enforcement" and "entitlement" appear to be synonymous.

"taken all of the required steps to *perfect* their interest in the rental proceeds" as of the Petition Date, *Cash Collateral Opinion II,* 120 B.R. at 338 (emphasis added), the caselaw is clear that perfection of an interest in rents under Virginia law is accomplished by recording the agreement that contains the assignment of rents provision.[10] *See Old Stone Bank v. Tycon I Bldg. Ltd. Partnership,* 946 F.2d 271, 272 (4th Cir.1991); *In re Brandon Assoc.,* 128 B.R. 729, 730 (Bankr.W.D.Va.1991) (hereinafter *"Brandon"*); *see also* Va.Code Ann. § 55–96 (1991). Since it is undisputed that the Deeds of Trust containing the Assignment of Rents were recorded years before the Petition Date, in 1984, it is clear that the Secured Creditors held a perfected interest in the rents from that time forward.

The Debtor effectively conceded this point at oral argument, *see* Transcript at 49, and to the extent that Judge Blackshear found that the Secured Creditors had not perfected their interest prepetition, we assume that the error derived from his failure to distinguish between the concepts of perfection and enforcement. The latter concept is of course the more important one on this appeal, and it is to that issue that we now turn.

*Enforcement of the security interest under Virginia law.*

■ Ignoring for a moment the complicating effect of bankruptcy, Judge Blackshear concluded in *Cash Collateral Opinion II* that the steps required to enforce an interest in rents depend upon the nature of the assignment of rents provision granting the interest. While an absolute assignment of rents provision is enforceable immediately upon default without any further action by the creditor, absent such a contractual provision the secured party holds a

"mere security interest" in the rents under Virginia law, and must obtain possession of the property subject to the lien before collecting the rental income. *Cash Collateral Opinion II,* 120 B.R. at 336–37. Since the decision in *Cash Collateral Opinion II,* four bankruptcy courts construing assignment of rents clauses under Virginia law have confirmed Judge Blackshear's statement of the law in this area, and we are satisfied that it is correct. *See In re Harbour Pointe Ltd. Partnership,* 132 B.R. 501, 502–03 (Bankr.D.D.C.1991); *Brandon,* 128 B.R. at 732; *In re Hall Elmtree Assoc., Ltd.,* 126 B.R. 73, 74 (Bankr.D.Ariz. 1991) (hereinafter *"Hall Elmtree"*); *In re Townside Partners,* 125 B.R. 8, 10 (Bankr. W.D.Va.1991) (hereinafter *"Townside"*).

■ We are also convinced by Judge Blackshear's determination that the Assignment of Rents provision in this case conferred a mere "lien in the rental proceeds and not an absolute transfer of title." *Cash Collateral Opinion II,* 120 B.R. at 337. To reach that finding, Judge Blackshear began with the premise that an absolute assignment of rents is created only when "the deed of trust itself ... demonstrate[s] an intention to create an absolute assignment"; the instant Assignment of Rents, by contrast, contained the phrase "as additional security hereunder" and provided that only "[u]pon acceleration" was the lender entitled to "take possession of and manage ... and collect the rents of the property." In light of those linguistic indications, the court concluded that the clause was intended only as a security interest, and was therefore subject to the general requirement that the creditor gain possession of the property before earning the right to the rental proceeds.[11] *Id.*

---

**10.** Although the requirements for perfection are determined by reference to non-bankruptcy state law and will therefore vary from state to state, it is worth noting that perfection is accomplished upon recordation in many states other than Virginia. *See, e.g., In re Tucson Indus. Partners,* 129 B.R. 614, 618 (9th Cir.BAP 1991) (Arizona); *Dash Point,* 121 B.R. at 855 (Washington); *In re Raleigh/Spring Forest Apartments Assoc.,* 118 B.R. 42, 45 (Bankr.E.D.N.C.1990)

(North Carolina); *In re Kearney Hotel Partners,* 92 B.R. 95 (Bankr.S.D.N.Y.1988) (Nebraska).

**11.** Judge Blackshear also rejected the Secured Creditors' argument that the "Remedies Cumulative" provision in the Deeds of Trust entitled them to enforce any segment of the Assignment of Rents provision, such as the right to collect rents, individually. While Judge Blackshear rejected the argument on contractual grounds, holding that the language was intended "to be construed in the conjunctive," 120 B.R. at 338,

Having examined the Assignment of Rents clause *de novo*, we agree that the language of this provision is distinguishable from those found by other courts to have conferred an absolute assignment. *See, e.g., Fidelity Bankers Life Insurance Co. v. Williams*, 506 F.2d 1242 (4th Cir. 1974); *Townside*, 125 B.R. 8. Thus, we affirm Judge Blackshear's findings with respect to the type of interest created by the Assignment of Rents as well.

While Judge Blackshear's analysis was correct as to the classification of the Assignment of Rents, however, we believe that his ultimate conclusion—that the automatic stay imposed by the Bankruptcy Code left the Secured Creditors without a means of enforcing their interest in rental proceeds—was erroneous. We next look at the automatic stay and "cash collateral" provisions of the Code to determine how they influence the rights of a creditor who holds a perfected but as yet unenforced interest in rental proceeds at the time of the bankruptcy filing.

*The Automatic Stay.*

Once a petition for bankruptcy is filed, § 362 of the Code prohibits "all entities" from taking actions to obtain possession of or from enforcing liens against the property of the estate. Section 362(a)(3), (4). By their very terms, therefore, the automatic stay provisions appear to deprive creditors of the opportunity to take the requisite steps to enforce their interests in rental proceeds under Virginia law.

The potential for this conflict between state and bankruptcy law was recognized early on by the *Butner* Court, which stated that "the federal bankruptcy court should take whatever steps are necessary to ensure that the mortgagee is afforded in federal bankruptcy court the same protection he would have under state law if no bank-

ruptcy had ensued." *Butner*, 440 U.S. at 56, 99 S.Ct. at 918. That language, according to one bankruptcy court that has addressed the issue, means "that the assignee may ask the bankruptcy court to authorize those actions necessary to enforce the assignment and thereby complete the assignee's entitlement to the rents." *In re Raleigh/Spring Forest Apartments*, 118 B.R. 42, 46 (Bankr.E.D.N.C.1990).

*The Cash Collateral Provisions.*

■ The Secured Creditors applied to the bankruptcy court for an order declaring that the rental proceeds were cash collateral entitled to special protection, which the bankruptcy court granted in *Cash Collateral Opinion I* and denied in *Cash Collateral Opinion II*. The Secured Creditors renew their efforts to have the rental proceeds declared cash collateral on this appeal,[12] and we now consider that issue.

"Cash collateral," as defined in § 363(a) of the Code, includes:

> ... cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired *in which the estate and an entity other than the estate have an interest* and includes the proceeds, products, offspring, *rents*, or profits of property subject to a security interest as provided in section 552(b) of this title whether existing before or after the commencement of a case under this title.

Section 363(a) (emphasis added). In order to be considered cash collateral, "an entity other than the estate" must have an "interest" in the assets, and that interest is created by state law. *See Dash Point*, 121 B.R. at 859.

While § 363(a) includes rents as one potential form of cash collateral, however, only those rents "subject to a security in-

---

other courts have recognized the "sound policy reasons" for requiring the secured party to gain possession of the property before collecting the rents. These include the "common sense observation that 'rents do not spring from the ground' and that if the mortgagee seeks to collect the rents the mortgagee must likewise undertake the responsibilities and liabilities of management and operation of the business premis-

es...." *Rancourt*, 123 B.R. at 148 (citation omitted).

12. The rental proceeds, which totaled approximately $2 million at the time of oral argument, have continued to accrue in the amount of approximately $90,000 per month. The funds have been held in escrow pending the outcome of this appeal. *See* Transcript at 13.

**54**

terest" within the meaning of § 552(b) qualify. Section 552(b) provides:

... [I]f the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to ... rents ... of such property, then such security interest extends to such ... rents ... acquired by the estate after the commencement of the case *to the extent provided by such security agreement and by applicable non-bankruptcy law,* except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

Section 552(b) (emphasis added). Whether a security interest survives the bankruptcy, therefore, is also ascertained by reference to state law.

A determination that assets constitute cash collateral is significant because it restricts the Debtor's use thereof unless the entity holding an interest in the assets consents or the court authorizes their use after notice and a hearing. Section 363(c)(2). Having carefully reviewed the language of the cash collateral provisions, the numerous bankruptcy court decisions that have grappled with the issue, and our prior analysis of Virginia law, we conclude that the rental proceeds are cash collateral entitled to those special protections.

As discussed above, the Secured Creditors held a perfected security interest in the rents from the moment they recorded the Deeds of Trust containing the Assignment of Rents. Upon the Debtor's default,[13] Virginia law required the Secured Creditors to gain possession of the property before they could realize their rights to the rental proceeds. We find, in keeping with one of the most persuasive bankruptcy decisions on the issue, that the mere existence of that enforcement hurdle "does not preclude the lienholder's having rights under state law which ... rise to the level of a 'security interest' in the rents suffi-

cient to render the rents cash collateral." *Dash Point,* 121 B.R. at 859. Having already determined that the act of perfection confers significant rights against third parties, it a small and logical step to find that the rents are assets in which "the estate and an entity other than the estate hold an interest," and that the properly recorded assignment of rents provision conferred a security interest in after-acquired rents which survives the bankruptcy even though it cannot be enforced because of the automatic stay. *Accord Brandon,* 128 B.R. at 734 (construing Virginia law); *In re KNM Roswell Ltd. Partnership,* 126 B.R. 548, 556 (Bankr.N.D.Ill.1991); *In re Tucson Indus. Partners,* 129 B.R. 614, 623–24 (9th Cir. BAP 1991) (hereinafter *"Tucson Industrial"*); *Rancourt,* 123 B.R. at 148; *Dash Point,* 121 B.R. at 860. Our conclusion that the rents are cash collateral is therefore consistent with the statutory language itself.

That conclusion is also supported by the legislative history underlying the enactment of §§ 363 and 552(b). The House Report addressing the adoption of those provisions states in pertinent part:

Under present law, there is no similar limit on the debtor's ability to use, sell, or lease soft collateral in the early stages of a reorganization. The protection of the secured creditor is left entirely to the judge. The debtor is usually able to obtain an ex parte order authorizing use, sale, or lease of property quickly, the secured creditor then has an uphill battle to have it overturned. The result has often been a serious erosion in secured creditors' rights because soft collateral is often easily dissipated or perishable. *The [new] provisions governing the right of the trustee or debtor in possession to use, sell, or lease soft collateral also require that the secured creditor's interest be adequately protected. This is protection that secured creditors do not have today. The bill as written is a significant boon to secured lenders.*

13. While the parties disagree as to the *date* of default, the *occurrence* of a default at some point prior to the Petition Date is not disputed by the Debtor.

H.R.Rep. No. 598, 95th Cong., 1st Sess. 182–83 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 6412, 6413 (emphasis added). Consistent with our holding, it is apparent that the cash collateral provisions were designed with the protection of secured creditors' interests in mind.

*Effect of a Finding of Cash Collateral Status.*

Having come to the conclusion that the unenforced interest in rents constitutes cash collateral, we recognize that § 363(c)(2) prohibits the Debtor's use of those assets without the Secured Creditors' consent or court authorization. Nor may such authorization be granted once the Secured Creditors have requested protection absent a finding that their interests are adequately protected. Section 363(e). The sole remaining questions with respect to the cash collateral issue are whether the Secured Creditors sought protection through an appropriate motion and from what date they are entitled to the rental proceeds.

The proper starting point for both of these inquiries is *Butner v. United States. Butner*'s salient holding is that a bankruptcy court construing an assignment of rents provision should take steps to ensure that "the mortgagee is afforded in federal bankruptcy court the same protection he would have under state law if no bankruptcy had ensued." 440 U.S. at 56, 99 S.Ct. at 918. That approach is necessary to prevent the parties—whether the secured creditor or the debtor—from "receiving 'a windfall merely by reason of the happenstance of bankruptcy.'" *Id.* at 55, 99 S.Ct. at 918 (citation omitted).

The Secured Creditors argue that their Motion for Sequestration of the rents as cash collateral was an appropriate method of enforcing their interest in the rents postpetition and that they are entitled to the rents from the date of the Debtor's default, whenever we determine that to have occurred. The Debtor argues that the Secured Creditors should have enforced their interest in the rents by first seeking relief from the stay pursuant to § 362(d) and then, assuming the relief was granted, by

obtaining possession of the property. *See* Transcript at 44–45.

Taking our guidance from *Butner*, we conclude that neither the Secured Creditors' nor the Debtor's position is entirely correct. Considering the Debtor's proposal first, we reject the contention that the Secured Creditors should be forced to demonstrate their entitlement to relief from the stay, which requires a showing that their security interest is inadequately protected or that the debtor has no equity in the rents and the rents are not necessary to an effective reorganization. Section 362(d). These requirements impose a burden on the Secured Creditors that they would not suffer under Virginia law in the absence of bankruptcy. That result is contrary to *Butner*, and we reject it.

At the same time, the Secured Creditors ask that in the event that we determine that the rents are cash collateral, as we have done, we find them entitled to the proceeds from the date of the Debtor's default. Had the bankruptcy not ensued, of course, the Secured Creditors would have been required under Virginia law to obtain possession of the property before collecting the rents. Because the automatic stay prevented those enforcement steps, we hold that the Secured Creditor's Motion for Sequestration served as an appropriate "enforcement-surrogate," and that the Secured Creditors are entitled to the rents from the date they filed that motion. To grant the Secured Creditors rights to the rents from the date of default, however, before they had taken *any* steps to enforce their interest in the rents, would be to extend them greater rights under the Bankruptcy Code than they would have had under Virginia law. That result is also contrary to *Butner*, and we reject it as well. *Accord Tucson Industrial*, 129 B.R. at 625–26 (Jones, B.J., dissenting).

2. The § 546(b) Notice Device.

Having determined that the Secured Creditors are entitled to sequestration of the rents under the cash collateral provisions, it is unnecessary for us to consider their alternative argument: that they "per-

fected" their security interest in the rents post-petition by filing the § 546(b) motion on December 29, 1989. Numerous bankruptcy courts have considered the applicability of § 546 to this context, and reached varying results. *See Rancourt,* 123 B.R. at 149 (collecting cases).

Although we need not address the issue, we feel compelled to comment that the Secured Creditors' § 546(b) argument appears to be driven by the same confusion between perfection and enforcement that has influenced the cash collateral caselaw. As Bankruptcy Judge Volinn observed in *Dash Point,* however:

> Because an assignment of rents is perfected when recorded, and recording perfects the interest as of the date of such recording (and not retroactively), § 546(b) has no application to the perfection of an assignment of rents. The enforcement actions of obtaining possession or seeking the appointment of a receiver are not acts required to accomplish perfection, and therefore those enforcement acts are not subject to § 546(b).

*Dash Point,* 121 B.R. at 861.

The Secured Creditors conceded that § 546(b) would not apply if we found that their interest in rents was perfected by recording. *See* Transcript at 21. Since we have indeed held that perfection is accomplished upon recordation under Virginia law, we need not discuss the § 546(b) issue any further.

The bankruptcy court's order denying the Motion for Sequestration of the cash collateral is hereby reversed, and we turn now to the merits of the second appeal.

## C. *The Escrow Appeal.*

█ In this appeal from the bankruptcy court's grant of summary judgment, the Secured Creditors challenge both aspects of the decision below. First, they contest the court's classification of the collateral as a general intangible, claiming instead that it was the intention of the parties to grant them a security interest in money. Second, they take issue with the bankruptcy court's conclusion that the security interest ex-

pired upon termination of the Escrow Agreement, pointing out "express language" in the Collateral Assignment to the contrary and proffering alternative readings of the Escrow Agreement itself. The Secured Creditors not only object to the lower court's decision to read the agreements as interrelated, but argue that the court's willingness to smooth over their various contractual ambiguities was inappropriate on summary judgment. Underlying all of these objections is the Secured Creditors' conviction that they were improperly denied discovery regarding the intentions of the parties to the various agreements.

Were it necessary for this Court to reach the bankruptcy court's decision with respect to the termination date of the Secured Creditors' security interest in the Escrow Funds, we would be compelled to confront the issue of whether the bankruptcy court exceeded its role regarding summary judgment by resolving material issues of fact. Because we find the decision with respect to classification of the collateral dispositive and proper for resolution by summary judgment, however, we need not address that argument.

### 1. Classification of the Collateral.

In the instant case, the parties do not dispute that the Collateral Assignment gave the Secured Creditors a security interest. *See Escrow Opinion* at 744. Their disagreement, instead, is over the *nature* of the collateral in which the assigned rights were acquired. Classification of collateral is important because it determines the actions the Secured Creditors were required to take to perfect their security interest under Virginia law. If the interest assigned was in a general intangible, as the Debtor claims, perfection could only have been accomplished by filing a financing statement, which the Secured Creditors concede they have not done. *See* Va.Code § 8.9–302. If the interest assigned was in money, however, as the Secured Creditors claim, perfection could have been accomplished through possession by the secured parties, Va.Code § 8.9–304(1), or a proper

"third-party bailee." *See In re Copeland,* 531 F.2d 1195, 1203 (3d Cir.1976); *In the Matter of O.P.M. Leasing Serv., Inc.,* 46 B.R. 661, 670 (Bankr.S.D.N.Y.1985).

The bankruptcy court below determined that the collateral was a contract right, which is a type of a general intangible under Virginia law. We agree. To determine the nature of the collateral, we consider applicable state law and the relevant contractual provisions. In this case, both sources confirm the lower court's determination.

Turning first to state law, it is clear that as a general matter, the Virginia Code's definition of a general intangible embraces contract rights. While the statutory provision defining general intangibles does not itself mention contract rights,[14] the Official Comment to the section specifically states: "The term 'general intangibles' brings under this Article miscellaneous types of contractual rights and other personal property which are used or may become customarily used as commercial security." *See* Va. Code.Ann. § 8.9–302, Official Comment. If the interest assigned to the Secured Creditors can be classed as a contract right, therefore, it is clear that it will fall within the definition of a general intangible under Virginia law.

Our review of the relevant agreements in this case convince us that the interest assigned to the Secured Creditors was indeed a contract right. The Collateral Assignment transferred to the Secured Creditors the Debtor's "rights to receive funds ... in the Escrow Account in accordance with the Escrow Agreement." Collateral Assignment ¶ 1, Escrow D–5, exh. d. Under the Escrow Agreement, in turn, the only interest the Debtor could have transferred was its interest in any residual funds remaining in the Escrow Account upon termination of the Escrow Agreement. *See* Escrow Agreement ¶ 5(e), Escrow D–5, exh. B; *Escrow Opinion* at 744. As the court below observed, that interest was a contingent one—contingent upon any funds remaining

in the Escrow Account upon termination of the Escrow Agreement. Thus, the bankruptcy court's conclusion that the Collateral Assignment "merely document[ed] a transfer in the Debtor's contractually negotiated rights to certain funds, in the event said funds exist" is well supported by the agreements at issue.

The propriety of that conclusion is buttressed by the reasoning of other courts asked to classify a contingent interest in escrow funds. In *In re Allen,* for example, the debtor entered into a purchase and escrow agreement with Vail Village in which he agreed to purchase a condominium "should it be built some time in the future." 888 F.2d 1299, 1300 (10th Cir. 1989). The prospective purchase was financed by a loan from Penn Square Bank, and the proceeds placed in an escrow account in accordance with the purchase and escrow agreement. Penn Square later sold the loan to Michigan National Bank, and the debtor executed a collateral assignment granting Michigan National a security interest in its rights under the purchase and escrow agreement. Michigan National filed a financing statement to perfect its interest in that agreement.

After an involuntary petition in bankruptcy was filed against the debtor some three months later, the trustee sought to avoid the assignment of the purchase and escrow agreement to Michigan National as a preferential transfer under 11 U.S.C. § 547(b). On appeal, however, the Tenth Circuit held that the debtor's "interest under the Agreement was contractual, emanating from the debtor's right to receive and apply escrowed funds to the purchase of the condominium *if built.*" *Id.* at 1302 (emphasis added). The Court therefore affirmed the lower courts' conclusions that the debtor's contract rights under the purchase and escrow agreement constituted a general intangible, and that the bank had properly perfected its security interest by filing a financing statement.

Despite their effort to present us with authority favorable to their position, the

---

**14.** "General intangible" is defined as "any personal property (including things in action) other than goods, accounts, chattel paper, documents, instruments or money." Va.Code.Ann. § 8.9–106.

cases cited by the Secured Creditors do not convince us that the bankruptcy court erred in classifying the security interest as a general intangible. The Secured Creditors urge us to consider the case *In the Matter of O.P.M. Leasing Serv., Inc.*, 46 B.R. 661 (Bankr.S.D.N.Y.1985), in which the bankruptcy court held that the secured party's interest in certain escrow funds was in money, and that perfection could therefore be accomplished by possession. As the court below recognized, however, the *O.P.M.* case is factually distinguishable from the case at bar: in the *O.P.M.* case, "a sum certain was placed in escrow for the sole benefit of the secured party," whereas in this case, the Escrow Funds were to be used to pay the operating expenses of the Debtor's property, and there was no guaranty that any funds would remain at the time the Debtor's interest was realized, i.e., the termination of the Escrow Agreement. *Escrow Opinion* at 744–45.

Nor do we find the Debtor's analogy to *In re Morristown Lincoln–Mercury, Inc.*, 27 B.R. 801 (Bankr.E.D.Tenn.1983), compelling. In that case, the relevant security agreement gave the secured party an interest in the debtor's merchandise and any "proceeds thereof." The bankruptcy court, called on to classify a reserve account containing the withheld proceeds, found that the funds were "quite simply money," and that perfection could therefore be accomplished by possession by the secured party. *Id.* at 807. In the instant case, by contrast, the relevant security agreement transferred to the Secured Creditors the Debtor's "*rights to receive* funds deposited ... in the Escrow Agreement," a type of interest which by its very terms conferred something other than the funds themselves.

The Secured Creditors' other attempts to resist summary judgment can be dismissed quickly. In an effort to demonstrate that their interest in the funds was not contingent, the Secured Creditors' argue that the Escrow Account could not be depleted because "the Purchase Agreement impose[d] an obligation on the Advancing Parties to deposit money in the account in the event that adequate funds were not available" to cover the operating expenses. *See* Brief of Appellants Trustbank Savings, F.S.B. and United Postal Savings Association at 32. As the Debtor points out, however, the Secured Creditors misstate the terms of the agreements: While the Purchase and Escrow Agreements do specifically address the Advancing Parties' obligation to cover deficits in the event that "no funds remain in the Escrow Account," they provide that such advances shall be considered non-interest bearing loans repayable to the Advancing Parties, and not to the Escrow Account itself. *See* Purchase Agreement ¶ 14(D); Escrow Agreement ¶ 4 (Escrow D–5, exhs. A & B).

Nor are we convinced by the argument that summary judgment was inappropriate in light of the bankruptcy court's refusal to permit discovery regarding the parties' intentions. As the above discussion suggests, we are of the view that even if the pertinent agreements contain some ambiguities or inconsistencies, they are clear with respect to the dispositive issue in this case—namely what type of collateral was assigned. Since any remaining issues of fact are not material ones, discovery would have been fruitless and the bankruptcy court's grant of summary judgment need not be disturbed. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant ... will not be counted.").

## III.  CONCLUSION

In light of the preceding discussion, the bankruptcy court's order denying the Secured Creditors' motion for Sequestration of the cash collateral is reversed, and its order granting summary judgment in favor of the debtor on the escrow appeal is affirmed.

SO ORDERED.