**In re 1550 WILSON BOULEVARD L.P., Debtor.**

**Bankruptcy No. 96–10346–AM.**

United States Bankruptcy Court,
E.D. Virginia,
Alexandria Division.

June 21, 1996.

Katherine A. Rolph, Swidler & Berlin, Chartered, Washington, DC, for the debtor in possession.

Michael L. Bernstein, Arnold & Porter, Washington, DC, former counsel for debtor in possession.

Richard E. Lear, Holland & Knight, Washington, DC, for the Equitable Life Assurance Society.

**MEMORANDUM OPINION**

STEPHEN S. MITCHELL, Bankruptcy Judge.

This matter is before the court on the motion of The Equitable Life Assurance Society of the United States ("Equitable") to require the debtor's former counsel, Arnold & Porter, to disgorge a prepetition retainer on the ground that it represents cash collateral subject to Equitable's lien. The debtor, 1550 Wilson Boulevard, L.P., filed memoranda in opposition to Equitable's motion. A hearing was held on May 21, 1996, after which the court took the matter under advisement. The court has considered the arguments of the parties and the relevant case law and is now prepared to rule.[1] For the reasons stated herein, the court concludes that Equitable's motion for disgorgement of the prepetition retainer should be denied except for the unearned portion now being held by successor counsel.

*Facts*

The essential facts are undisputed. 1550 Wilson Boulevard, L.P. ("1550 Wilson"), a Virginia limited partnership, filed a voluntary chapter 11 petition in this court and continues in operation of its business as debtor in possession. Its sole asset is a seven-story office building located at 1550 Wilson Boulevard, Arlington, Virginia. The property is encumbered by a deed of trust in favor of Equitable securing a promissory note dated October 6, 1987 in the original principal amount of $20,160,000. Equitable's claim on the date the debtor filed its petition was $22,353,967. Equitable's note is further secured by an assignment of leases recorded contemporaneously with the deed of trust.

The deed of trust states in part:

PROVIDED ALWAYS ... until the happening of any occurrence or event which gives beneficiary the option to cause the entire indebtedness then secured by this deed of trust to become due and payable, grantor shall have the right to possess and

1. A similar motion was filed in the related case of 1560 Wilson Boulevard, L.P., No. 96–10403–AM. Because the relevant language of the loan documents differs somewhat, a separate opinion is being issued in that case.

enjoy the premises and to receive the rents, issues and profits thereof ...

\* \* \* \* \* \*

4. That the whole of the principal sum and the interest shall become due at the option of the beneficiary: (a) after default in the payment of any instalment of principal and/or interest secured hereby for 10 days; or ... (j) upon default in the observance or performance of any other covenants or agreements of grantor hereunder after default for 30 days after notice (or longer if necessary in the discretion of the beneficiary); ...

The assignment contains the following language:

A. So long as there shall exist no default by the Assignor in the payment of any indebtedness secured hereby or in the performance of any obligation of the Assignor herein or in the Mortgage or any other instrument securing said indebtedness, the Assignor shall have the right to collect, but not more than 30 days prior to accrual, all rents, issues and profits from the premises and to retain, use and enjoy the same.
B. Upon the payment in full of all indebtedness secured hereby, as evidenced by the recording or filing of an instrument of satisfaction or full release of the Mortgage without the recording of another Mortgage in favor of the Assignee affecting the premises, this Assignment shall become and be void and of no effect.

\* \* \* \* \* \*

5. The whole of said indebtedness shall become due ... (b) at the option of the Assignee, ... after any default by the Assignor hereunder and the continuance of such default for 10 days after notice and demand or such longer period if deemed necessary by the Assignee in its reasonable discretion.

6. After any ... default by the Assignor in the payment of said indebtedness ..., the Assignee, at its option, without notice, irrespective of whether Declaration of Default under any deed of trust has been delivered to the trustee ... may: enter upon, take possession of, and operate the premises ... and either with or without taking possession of the premises, in its own name, sue for or collect and receive all rents, issues and profits ...

\* \* \* \* \* \*

11. Notwithstanding anything to the contrary contained in this Assignment, a default, as the term is used herein, shall not be deemed to have occurred until all applicable notices, if any, have been given and any applicable cure period, if any, shall have expired without the cure of such default.

The original promissory note was due in full on October 1, 1992, but on April 1, 1991 [2] an allonge (the "First Allonge") was executed extending the maturity to April 1, 1995, with provision for a further extension to April 1, 1998, if certain conditions were met. It does not appear that the conditions for the extension beyond April 1, 1995, were met, but apparently the parties informally agreed to extend the due date to September 1, 1995. After that the debtor continued to make, and Equitable accepted, monthly payments in September, October, and November, 1995.

The debtor did not make a December payment. On December 14, 1995, the debtor paid a retainer of $108,000 to the law firm of Arnold & Porter.[3] On January 11, 1996, Equitable sent a default notice to the debtor revoking the debtor's right to collect rents. The debtor responded by filing a chapter 11 petition in this court on January 26, 1996. At some point shortly prior to the filing of the chapter 11 petition, Arnold & Porter

**2.** A supplemental Assignment of Lessor's Interest in Lease, also executed on April 1, 1991, is identical to the original assignment of leases executed on October 6, 1987.

**3.** The parties have stipulated that the source of the retainer was rents collected from the property. In argument, the debtor asserted that the retainer consisted entirely of rents collected prior

to default. That it consisted entirely of rents collected prior to a formal declaration of default is self-evident, but whether the rents were collected prior to or after the debtor's failure to make the December 1995 payment cannot be determined from the limited evidence presented at the hearing, and the court expressly makes no finding.

applied $31,489 of the retainer to prepetition work it had performed on the debtor's behalf. This court subsequently disapproved the application of Arnold & Porter to be employed as counsel to the debtor in possession based on a conflict of interest. The court nevertheless approved, on a quantum meruit basis, the firm's application for professional compensation and reimbursement of expenses in the amount of $41,080.80. In approving the compensation and expenses, however, the court expressly reserved ruling on whether the firm could draw down on the retainer for the amount of the approved fees and expenses and whether the balance of the retainer could be transferred to the debtor's new counsel, Swidler & Berlin.[4]

### Conclusions of Law and Discussion

Equitable contends that the unapplied retainer paid to Arnold & Porter ought to be disgorged because it is property of the estate and is cash collateral subject to Equitable's security interest.[5]

■ Here, the debtor does not dispute that the unapplied retainer is property of the estate that is being held in trust.[6] Nor does it dispute that the post-petition rents are Equitable's cash collateral. The only dis-

agreement between the parties concerns the rents which were paid prepetition—and prior to Equitable's invocation of its right to collect rents on account of the debtor's default—to Arnold & Porter as a retainer. Equitable asserts that it has had a perfected security interest in all rents of the property since the recordation of the assignment of leases, and that it need do nothing further whatsoever to invoke its rights. Accordingly, Equitable contends that—irrespective of whether the debtor was in default under its obligations to Equitable—"all of the Rents of the Property have been Equitable's collateral since 1987 and, on the Petition Date, the Rents became 'cash collateral' as defined under section 363(a) of the Code." Reply Memorandum of Equitable, p. 9. For its part, the debtor contends that under the loan documents Equitable does not have a lien on pre-default rents, and that the retainer, therefore, does not constitute Equitable's cash collateral.

■ Since Equitable objects to the payment of the debtor's attorneys fees from the retainer, whether or not the rents from which those retainers originated are "cash collateral" is material.[7] Section 363(a), Bankruptcy Code, defines cash collateral as:

---

**4.** In approving compensation to Arnold & Porter, the court authorized the physical transfer of the remaining $35,430.00 to Swidler & Berlin pending, and subject to, the ruling on the present motion.

**5.** As a preliminary matter, Equitable also contends that the debtor is judicially estopped from arguing that Equitable does not have a lien in the retainer. The court does not concur. Equitable relies on the March 6, 1996 stipulated cash collateral order, which states: "WHEREAS Equitable is a secured creditor in this case having a perfected lien on the Property and a proper, perfected assignment in all of the Debtor's right, title and interest in or under certain leases affecting the Property and all of the Rents of the Property" (Cash Collateral Order, p. 4) Accordingly, Equitable contends that the debtor is barred from taking any position inconsistent with the cash collateral order. *United Virginia Bank/Seaboard National v. B.F. Saul Real Estate*, 641 F.2d 185, 190 (4th Cir.1981) (litigants prohibited from playing "fast and loose" and are barred from taking inconsistent positions during the course of litigation). The debtor responds that both parties were aware of the dispute over the retainer and, as a result, it was specifically "carved out" of the cash collateral order. The court agrees. Despite the broad prefatory lan-

guage of the order, provision 4 specifically states: "Such remaining Cash Collateral collected (whether before, on or after the Petition Date) and in the Debtor's possession and control on or after the Petition Date but prior to the execution of this Stipulation and order *shall not include sums paid as a retainer to Debtor's counsel prior to the Petition Date out of the Cash Collateral collected by the debtor.* Nothing in this Stipulation and Order shall be construed as a waiver of any right held by Equitable to seek the return of any and all such retainers from Debtor and/or Debtor's counsel or *the right of the Debtor or its counsel to oppose any such attempt.*" (Cash Collateral Order, p. 6) (emphasis added).

**6.** Retainers in bankruptcy cases are generally considered advance payments of fees that are to be held in trust until the court awards a fee and authorizes the fee to be paid from the fund. The bankruptcy retainer is, then, a deposit for work to be performed in the future. *In re Plaza Hotel Corporation*, 111 B.R. 882, 883 n. 1 (Bankr.E.D.Calif.1990).

**7.** Under § 363(c)(2), Bankruptcy Code, "[a debtor in possession] may not use ... cash collateral ... unless—(a) each entity that has an interest in

cash, negotiable instruments, documents of title, securities, deposits accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the ... rents ... of property subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

11 U.S.C. § 363(a). Accordingly, under § 363(a), rents received from a mortgaged property, either before or after a bankruptcy filing, would be cash collateral to the extent they are subject to a security interest or lien under § 552(b).[8] For bankruptcy purposes, a "security interest" is defined as a "lien created by agreement" and a "security agreement" is defined as "agreement that provides for a security interest." §§ 101(50) and (51), Bankruptcy Code. Similarly, a lien is defined as a "charge against or interest in property to secure payment of a debtor or performance of an obligation." § 101(37), Bankruptcy Code.

In *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979), the Supreme Court held that bankruptcy courts must look to state law to determine the nature and validity of a security interest in rents. In this connection, Va.Code Ann. § 55–220.1 (Michie 1992), upon which Equitable chiefly relies, provides:

> The recordation pursuant to § 55–106 ... of any deed, deed of trust or other instrument ... assigning the interest of the ... assignor ... in rents or profits

arising from the real property described in such deed, deed of trust or other instrument, shall fully perfect the interest of the ... assignee as to the assignor and all third parties without the necessity of (i) furnishing notice to the assignor or lessee, (ii) obtaining possession of the real property, (iii) impounding the rents, (iv) securing the appointment of a receiver, or (v) taking any other affirmative action. The lessee is authorized to pay the assignor until the lessee receives written notification that rents due or to become due have been assigned and that payment is to be made to the assignee. This section shall apply to all instruments of record before, on or after July 1, 1992.

■ The effect of this statute, which was enacted to modify the long-standing rule of Virginia law that had required an affirmative act by the lender to perfect an assignment of rents,[9] is to make it clear that a lender's security interest under an assignment of rents is perfected when the assignment is recorded in the land records. Furthermore, no notice need be provided to the assignor and no affirmative action need be taken to perfect the interest of the assignee as to the assignor and all third parties.[10]

■ There can be little doubt that where an assignment of rents has been properly recorded, rents collected by the debtor prepetition and held in an identifiable account constitute cash collateral even in the absence of an affirmative prepetition act to enforce direct collection of the rents. *In re*

such cash collateral consents; or (B) the court, after notice and hearing, authorizes such use ... in accordance with the provisions of this section."

**8.** § 552(b), Bankruptcy Code, provides: "[I]f the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to ... rents ... of such property, then such security interest extends to such ... rents ... acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law."

**9.** *Frayser's Administrator v. Richmond & A.R.R. Co.,* 81 Va. 388 (1866) ("*Frayser's* rule"). Under

*Frayser's* rule, the enforcement of an assignment of rents generally required the mortgagee to either first take possession of the premises or to obtain the appointment of a receiver. However, the parties could, by appropriate language in the security instruments, contract around *Frayser's* rule by providing for an "absolute" assignment of rents upon default without the necessity for the mortgagee taking any other steps to protect its rights. *Fidelity Bankers Life Insurance Company v. Williams,* 506 F.2d 1242 (4th Cir.1974).

**10.** Of course, the statute also protects the tenant by permitting the tenant to pay the landlord, instead of the lender, until the tenant receives written notice that rent is to be paid to the lender.

*Hall Colttree Associates,* 146 B.R. 675 (Bankr.E.D.Va.1992) (Tice, J.); *In re Vienna Park Properties,* 136 B.R. 43 (S.D.N.Y.1992) *aff'd,* 976 F.2d 106 (2d Cir.1992).[11] It is equally clear that a lender's security interest may also extend to rents that have been paid over prepetition to debtor's counsel as a retainer for services to be performed in a bankruptcy case. *Hall Colttree,* 146 B.R. at 679.[12] The question before the court in this case is whether the language in the assignment of leases gave the debtor an absolute right to use the rents prior to the lender's formal declaration of a default, thereby compelling a different result than the one reached in *Hall Colttree.*

 The loan documents in this case are not a model of internal consistency. As often seems to be the case in commercial loan documentation, clause is piled upon clause with scant attention by the drafter to harmonizing their provisions. Nevertheless, it is the duty of the court, where a business transaction is based upon more than one document executed contemporaneously by the parties, as is here the case, to construe the documents together to determine the intent of the parties. *Daugherty v. Diment,* 238 Va. 520, 385 S.E.2d 572 (1989) (provisions of land contract, note, deed of trust and assignment executed contemporaneously construed harmoniously). In construing such written instruments, Virginia follows the "plain meaning" rule stating that "[W]here an agreement is complete on its face, is plain and unambiguous in its term, the court is not at liberty to search for its meaning beyond the instrument itself." *Capital Commercial Properties, Inc. v. Vina Enterprises, Inc.,* 250 Va. 290, 294, 462 S.E.2d 74, 77 (1995). Consequently, courts cannot "read into contracts language which will add to or take away from the meaning of the words already contained therein." *Wilson v. Holyfield,* 227 Va. 184, 187, 313 S.E.2d 396, 398 (1984).

 The assignment of leases states unambiguously in paragraph A that as long as there is no "default ... in the *payment* of any indebtedness secured hereby," the debtor "shall have the right to collect ... all rents ... from the premises *and to retain, use and enjoy* the same" (emphasis added). Paragraph 5 requires a 10–day notice and opportunity to cure prior to *acceleration* of the indebtedness, but paragraph 6 allows the lender to collect rents after "any default ... in the *payment* of said indebtedness ... *without notice, irrespective* of whether Declaration of Default under any deed of trust has been delivered to the trustee." (emphasis added). While at first blush the 10–day notice requirement of paragraph 5 appears to conflict with the no-notice language in paragraph 6, the two can be harmonized by recognizing acceleration as a remedy separate and distinct from collection of the rents. That is, the lender cannot call the loan without first giving the borrower notice of the payment default and an opportunity to cure. However, the lender has the right, in the event of "any" default in payment—and without first being required to accelerate the indebtedness—to collect the rents and apply them to the note.

The complicating factor in the present case is paragraph 11. This provision, added by typewriter to an otherwise printed-form document, states that "Notwithstanding anything to the contrary contained in this Agreement, a *default,* as the term is used herein, shall not be deemed to have occurred until all applicable notices, if any, have been given and any applicable cure period, if any, shall have expired without the cure of such default" (emphasis added). That the parties must have intended this added provision to have some meaning seems self-evident— there would hardly be any point in adding to a printed form of agreement language that

---

11. Both *Hall Colttree* and *Vienna Park* were decided before the effective date of Va.Code Ann. § 55–220.1. If anything, the enactment of § 55–220.1 strengthens the conclusion reached in those cases.

12. In *Hall Colttree,* the court, while holding that a post-default retainer paid to the debtor's bankruptcy counsel from rents constituted cash collat-

eral, declined "on the evidence at hand" to order disgorgement pending a determination of whether another form of adequate protection, such as the grant of a replacement lien, would protect the lender's interest. The court made it clear, however, that if other forms of adequate protection were insufficient, it would consider ordering turnover of the retainer

was merely surplusage—but at the same time it is far from clear what the additional language was intended to accomplish. Literally, neither the deed of trust nor lease assignment defines a default, as such, as being dependent on the giving of notice; however, the exercise of the landlord's most significant remedy on default—acceleration of the indebtedness—does require notice and an opportunity to cure. While the matter is not totally free from doubt, the most reasonable construction of paragraph 11 is that it limits the otherwise broad language of paragraph 6 by assuring the debtor of notice and an opportunity to cure before the lender would be able to invoke direct collection of rents. Moreover, until there is a "default"—in the now-modified sense of paragraph 11—the debtor retains under paragraph A the right to "retain, use and enjoy" the rents from the premises.

Given the debtor's unrestricted right to use the funds prior to "default", and the undisputed fact that the $108,000 retainer was paid over to the law firm prior to the lender's sending of a default notice, the court concludes that the law firm's interest in the earned portion of the retainer are superior to that of Equitable. Therefore, the $108,000 retainer, which was paid to Arnold & Porter on December 14, 1995, was paid prior to default—when 1550 Wilson clearly had an absolute right to use and enjoy the rents— and, to the extent that it serves as security for Arnold & Porter's approved fees and expenses, need not be disgorged.[13] Once paid over to Arnold & Porter, the retainer became security for fees already earned or to be earned in the future. For that reason, Arnold & Porter will be permitted to draw down on the retainer with respect to the $41,080.80 in post-petition fees and expenses that the court has approved.

That leaves for consideration the issue of whether the remaining sum of approximately $35,430.00 transferred to Swidler & Berlin as successor counsel may be held by that firm as a retainer. There can be little doubt that, until earned, a retainer remains the property of the client. Accordingly, the $35,430.00 is property of the estate, and since there are no further legal services to be performed by Arnold & Porter, it has no claim to those funds. As property of the estate, the funds must be turned over to the debtor in possession. § 542(a), Bankruptcy Code. Since it is undisputed that the funds consist entirely of rents subject to Equitable's security interest, and since those funds have neither been spent nor transferred as security prior the declaration of default, they constitute cash collateral[14] and cannot now be used by the debtor to pay a post-petition retainer to Swidler & Berlin unless either Equitable consents or the court permits such use on a proper showing of adequate protection. § 363(c)(2) and (e), Bankruptcy Code. Although the debtor argued at the hearing on the motion to disgorge that Equitable's interest in the rents is more than adequately protected, there is insufficient evidence before the court at this time to make that determination, and the court declines on the present record to make a ruling one way or the other.[15] Rather, the court will require that the unearned retainer now held by Swidler & Berlin be paid over to the debtor in possession and held subject to the terms of the existing cash collateral order and any future orders this court may enter authoriz-

13. With respect to the $31,489 drawn down by Arnold & Porter prior to the chapter 11 filing, the court's present ruling is not a determination that such payment was proper and is without prejudice to the right of a party with proper standing to object to, and seek disgorgement of, such payment under, for example, §§ 329(b) or 547(b), Bankruptcy Code.

14. *See, Green Hills Production Credit Assn. v. Gerlach (In re Gerlach)*, 64 B.R. 25 (Bankr. W.D.Mo.1986).

15. In *Principal Mutual Life Insurance Co. v. Atrium Development Co. (In re Atrium Development Co.)*, 159 B.R. 464, 471 (Bankr.E.D.Va.1993), Judge Tice noted: "Adequate protection is typically established by the fact that cash is being used to maintain and enhance the value of the underlying income producing real property in which the creditor also usually holds a security interest. Other factors are also considered such as whether there is equity in the property, whether the property is declining in value, and whether or not post-petition payments due the creditor are current." In particular, no evidence has been presented to this court as to the value of the property or what equity, if any, exists.

ing the debtor to use cash collateral. This ruling is without prejudice to the debtor's right to file a motion to use Equitable's cash collateral to pay a reasonable post-petition retainer to Swidler & Berlin.

A separate order will be entered consistent with this opinion.